### In Re NEW MOTOR VEHICLES CANADIAN EXPORT ANTI-TRUST LITIGATION

### No. MDL DOCKET NO. 1532.

United States District Court,
D. Maine.

Dec. 8, 2004.

166

Robert S. Frank, Harvey & Frank, Portland, ME, for Plaintiffs.

William J. Kayatta, Jr., Pierce Atwood, Portland, ME, for Defendants.

## ORDER ON DEFENDANTS' MOTION TO DISMISS CERTAIN CLAIMS IN PLAINTIFFS' SECOND AMENDED COMPLAINT

HORNBY, District Judge.

Buyers and lessees [1] of new motor vehicles have sued automobile companies and two national dealer associations. They claim that these defendants conspired among themselves and with unnamed dealers to prevent less-expensive Canadian vehicles from entering the American market. This conduct, they contend, foreclosed a discount distribution channel and caused new vehicle prices in the United States to rise to artificially high levels. I ruled previously that these consumers can seek injunctive relief under federal antitrust law.

---

1. For convenience, I will refer only to buyers throughout the rest of this opinion.

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.,* 307 F.Supp.2d 136, 144 (D.Me.2004). I also ruled that they cannot recover federal antitrust damages because of the Supreme Court's ruling in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), unless they join as named defendants the dealers from whom they bought and prove that those dealers joined the conspiracy. *In re New Motor Vehicles,* 307 F.Supp.2d at 141–43.

After that ruling, these consumers filed a Second Amended Complaint. They still do not name the dealers as defendants, although they do allege that the automobile companies and dealer associations engaged in concerted action with American and Canadian dealers. Second Am. Consolidated Class Action Compl. for Violations of the Sherman Antitrust Act ("Second Am. Compl.") (Docket Item 109). They continue to seek damages from the automobile companies and dealer associations, but this time for violations of state antitrust and consumer protection statutes and on the basis of common law restitution. They also still seek injunctive relief under federal antitrust law. All defendants move to dismiss a number of the state law claims pursuant to Fed.R.Civ.P. 12(b)(6). Defs.' Mot. to Dismiss Certain Claims in Pls.' Second Am. Compl. ("Defs.' Mot.") (Docket Item 122).

The motion to dismiss is GRANTED as to the Louisiana antitrust claim, but DENIED as to the antitrust claims for the District of Columbia, Michigan, Minnesota, Mississippi, Nevada, New Mexico, South Dakota, Tennessee, West Virginia and Wisconsin. The defendants did not move to dismiss the Arizona, California, Kansas, Maine, North Carolina, North Dakota and Vermont antitrust claims. Therefore, the antitrust claims remain for sixteen states and the District of Columbia.

The motion to dismiss is GRANTED as to the state consumer protection claims for Arizona, Colorado, Connecticut, Delaware, Georgia, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Dakota, Tennessee and Virginia. The plaintiffs have not opposed the motion to dismiss the Illinois, Oregon, Texas and Washington consumer protection claims and the motion to dismiss those claims is also GRANTED. The motion to dismiss is DENIED as to the consumer protection claims for Arkansas, Maine, Montana, New Hampshire, New Mexico and Vermont. The motion to dismiss the consumer protection claims for the District of Columbia, Idaho and Utah is GRANTED as to the dealer associations, but otherwise DENIED. The defendants did not move to dismiss the consumer protection claims for Alaska, California, Nebraska, Nevada, North Carolina and West Virginia. Therefore, consumer protection claims remain for fourteen states and the District of Columbia.

The motion to dismiss is GRANTED as to all restitution claims against the dealer associations. The motion to dismiss the restitution claims is DENIED as to the states where state antitrust or consumer protection claims remain, but otherwise GRANTED.

## I. APPLICABLE STANDARDS

### (A) Facts

In ruling on a 12(b)(6) motion, I "must accept as true the well-pleaded factual allegations of the complaint [and] draw all reasonable inferences therefrom in the plaintiff's favor." *LaChapelle v. Berkshire Life Ins. Co.,* 142 F.3d 507, 508 (1st Cir. 1998). A 12(b)(6) motion should be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."

*Pena–Borrero v. Estremeda,* 365 F.3d 7, 11 (1st Cir.2004). Certainly I would prefer to have seen factual allegations tied more directly to the new theories in the Second Amended Complaint; it would have made review of this 12(b)(6) motion much easier.[2] Nevertheless, if the plaintiffs satisfy the liberal pleading standards applicable to a 12(b)(6) motion, any factual inadequacies in their claims will be tested at trial or on summary judgment, not on a motion to dismiss.

### (B) Law

 In ruling on state law claims, I follow a decision of the highest state court "unless there are very persuasive grounds for believing that the state's highest court would no longer adhere to it." 19 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 4507, at 92 (1982); *see also Johnson v. Fankell,* 520 U.S. 911, 916, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997) ("Neither this Court nor any other federal tribunal has any authority to place a construction on a state statute different from the one rendered by the highest court of the State."). In the absence of a ruling by the state's highest court, I consider and may follow intermediate court rulings unless I am convinced that the state's highest court would decide otherwise. *Hicks ex rel. Feiock v. Feiock,* 485 U.S. 624, 630 n. 3, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988); 19 Wright, *supra,* § 4507, at 94–95. State trial court rulings provide guidance but are not controlling unless they are treated as precedents within the state itself. 19 Wright, *supra,* § 4507, at 96. State court

dicta also provide "persuasive evidence of how the state court might decide the point." *Id.* at 97.

## II. ANALYSIS

I deal with the claims that are new to the Second Amended Complaint in three categories: state antitrust claims, state consumer protection claims and restitution claims.

### (A) State Antitrust Claims

The defendants urge me to dismiss eleven of the eighteen state antitrust claims primarily because of state bans on indirect purchaser lawsuits and what they say is the plaintiffs' failure to allege sufficient intrastate conduct.

### District of Columbia, Michigan and Minnesota Antitrust Claims

 For the District of Columbia, Michigan and Minnesota, the defendants move to dismiss on the ground that the plaintiffs "pleaded monopolization—a single actor offense—rather than a combination in restraint of trade." Defs.' Mot. at 6. The plaintiffs respond that an inadvertent typographical error caused this pleading mistake.[3] Pls.' Opp'n to Defs.' Mot. to Dismiss Certain Claims in Pls.' Second Am. Compl. ("Pls.' Opp'n") at 2 n. 2 (Docket Item 135). The defendants do not pursue the issue in their Reply memorandum. I accept the plaintiffs' correction. I also note that the plaintiffs need not cite the correct statutory provision to state a claim for relief, because "[a] complaint sufficiently raises a claim even if it points to no

---

2. The plaintiffs left virtually unchanged the factual assertions of the First Amended Complaint, which focused on interstate and international activity in support of the federal Sherman and Clayton Act challenges. It would have been helpful if the plaintiffs had added allegations of state-directed activity.

3. The plaintiffs cited section 28–4503 of the District of Columbia Code rather than section 28–4502, section 445.773 of the Michigan Compiled Laws rather than section 445.772 and section 325D.52 of the Minnesota Statutes rather than section 325D.51.

legal theory or even if it points to the wrong legal theory as a basis for that claim, as long as relief is possible under any set of facts that could be established consistent with the allegations." *Morales–Vallellanes v. Potter*, 339 F.3d 9, 14 (1st Cir.2003) (citation omitted).

### Louisiana Antitrust Claim

■ The defendants challenge the Louisiana antitrust claim on the basis that indirect purchasers cannot recover for antitrust injury in Louisiana. The parties do not cite, and I have not found, any Louisiana state court opinions on point. Accordingly, I follow the Fifth Circuit's holding in *Free v. Abbott Laboratories, Inc.*, 176 F.3d 298, 299 (5th Cir.1999), that "Louisiana courts would follow the federal indirect purchaser rule." *Accord FTC v. Mylan Labs., Inc.*, 99 F.Supp.2d 1, 6 (D.D.C.1999). The plaintiffs challenge this federal court interpretation of Louisiana law. They cite *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 493 So.2d 1149, 1154 (La.1986), for the proposition that "Louisiana's antitrust statute was 'intended to be sweeping in its breadth.' " [4] Pls.' Opp'n at 3. In *Louisiana Power*, however, the Supreme Court of Louisiana was dealing with Louisiana Revised Statutes section 51:122, a sweeping provision that forbids "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state," La.Rev.

Stat. § 51:122(A). Section 51:137, on the other hand, is Louisiana's antitrust remedy provision. It provides that "[a]ny person who is injured in his business or property by any person by reason of any act or thing forbidden by this Part may sue." *Id.* § 51:137. Although the term "any person" seems broad (as the plaintiffs contended at oral argument), the Fifth Circuit concluded in *Free* that the modifying language of this section limits recovery to "the extent of injury to 'business or property' comprehended by the antitrust laws," a limitation that precludes recovery by indirect purchasers. 176 F.3d at 300 (citing *Illinois Brick*, 431 U.S. at 729, 97 S.Ct. 2061). I agree.[5] I therefore GRANT the defendants' motion to dismiss the plaintiffs' Louisiana antitrust claim on the ground that the plaintiffs are indirect purchasers.

### Mississippi Antitrust Claim

■ In support of their motion to dismiss the Mississippi antitrust claim, the defendants argue that the Mississippi antitrust statute is limited to intrastate conduct. To be sure, in many ways, the Mississippi antitrust statute is inward-looking.[6] Nevertheless, the definition of "trust or combine" is broad, and the statute prohibits agreements to "restrain trade," "increase ... the price of a commodity" or "hinder competition in the production, *importation* ... sale or pur-

---

**4.** The plaintiffs also cite *Louisiana ex rel. Ieyoub v. Borden, Inc.*, Civ. A. No. 94–3640, 1995 WL 59548 (E.D.La. Feb. 10, 1995). That earlier federal trial court decision is obviously superseded by the Fifth Circuit's more recent decision in *Free*.

**5.** The plaintiffs cite Daniel R. Karon, *"Your Honor, Tear Down That Illinois Brick Wall!" The National Movement Toward Indirect Purchaser Antitrust Standing and Consumer Justice*, 30 Wm. Mitchell L.Rev. 1351, 1377–78 (2004), to support their claim that Louisiana permits indirect purchaser suits. Pls.' Opp'n

at 3 n. 4. This article contains no persuasive Louisiana authority to support the plaintiffs' position.

**6.** For example, the price discrimination provision is directed at price differentials between localities within the state, Miss.Code Ann. § 75–21–3(d), and venue lies "in the county where the trust and combine was formed, or where it exists or is carried on ... or in any county in which either of the defendants may have a domicile, or where an officer or agent of any defendant corporation may be found," *id.* § 75–21–21.

chase of a commodity." Miss.Code Ann. § 75–21–1 (emphasis added).

Both sides point to *Standard Oil Co. of Kentucky v. State*, 107 Miss. 377, 65 So. 468 (1914), in support of their respective positions. *Standard Oil* was a decision addressing how far Mississippi's antitrust law could extend constitutionally without violating the interstate commerce clause. *Id.* at 471. Nevertheless, its reasoning provides some guidance on the intended scope of the state's antitrust laws. In this early case, the Mississippi Supreme Court explained that sales and distribution within Mississippi are intrastate in character when made "after the ... products [have] been received ... in this state and ... incorporated into the general mass of property therein." *Id.* at 470. It held that "to be punishable under state laws, [a conspiracy to monopolize trade] must have as one of its objects a monopoly in the intrastate trade ... to be accomplished in part at least by transactions which are also wholly intrastate." *Id.* at 471. *See also In re Microsoft Corp. Antitrust Litig.*, No. MDL 1332, 2003 WL 22070561 (D.Md. Aug. 22, 2003) (following *Standard Oil* and stating that in order for a claim to come within the scope of the Mississippi antitrust statute, a plaintiff must allege "at least *some* conduct ... which was performed wholly intrastate").

In this case, a reasonable inference from the Second Amended Complaint[7] is that the manufacturers wanted Mississippi dealers (like those of every other state) to charge Mississippi consumers higher prices as a result of the lack of competition from imported Canadian vehicles.[8] This would "hinder competition in the ... importation ... of a commodity." *See* Miss. Code Ann. § 75–21–1. Moreover, some of those sales would occur wholly within the State of Mississippi, after the vehicle had been "incorporated into the general mass of property" in the state, thereby falling within the compass of the Mississippi antitrust statute. The motion to dismiss the Mississippi antitrust claim is therefore DENIED.

### Nevada Antitrust Claim

■ The defendants contend that Nevada's antitrust coverage is limited to intrastate activities. They rely solely on the statutory language; neither side cites case law. The Nevada Unfair Trade Practice Act enumerates a wide range of prohibited anticompetitive behaviors and declares it "unlawful to conduct any part of any such activity in this state." Nev.Rev.Stat. § 598A.060. The allegations of the Second Amended Complaint certainly could have been more fulsome on this subject. Nevertheless, I conclude that it is reasonable to read it as alleging concerted action among the manufacturers and Nevada dealers, a conspiracy contemplating vehicle sales in Nevada at higher prices because of the exclusion of Canadian vehicles. *See* Second Am. Compl. ¶¶ 39, 65 (naming United States dealers as coconspirators and alleging concerted action between United States dealers and defendants to implement the conspiracy). Under such a reading, the Second Amended Complaint

---

7. The defendants point out correctly that the plaintiffs "do not allege state-specific activities, nor do they allege that the conduct in furtherance of the purported conspiracy was directed at the commerce of any specific state." Defs.' Mot. at 4. As I have already noted, such detail certainly would have been helpful, but its absence is not fatal in light of the reasonable inferences to be drawn from the Second Amended Complaint.

8. The plaintiffs confirm this reading in their legal memorandum, which describes the Second Amended Complaint as detailing a "scheme to force American consumers in all fifty states to pay artificially inflated prices for new automobiles." Pls.' Opp'n at 1.

alleges that a part of the conspiracy was conducted in the State of Nevada. The motion to dismiss the Nevada antitrust claim is therefore **DENIED**.

### New Mexico Antitrust Claim

■ The defendants seek dismissal of the New Mexico claim for failure to allege sufficient intrastate activity. New Mexico prohibits every conspiracy "in restraint of trade or commerce, any part of which trade or commerce is within this state." N.M. Stat. Ann. § 57–1–1. Unlike some state statutes, the New Mexico antitrust provision makes it crystal clear that only the trade or commerce, not necessarily the conspiracy, must be within the state. The New Mexico statute further specifies that an effect on, or involvement of, interstate or foreign commerce does not bar application of the state statute. *Id.* § 57–1–13. New Mexico vehicle sales are certainly trade or commerce within the State of New Mexico. The defendants' motion to dismiss the New Mexico antitrust claim is therefore **DENIED**.[9]

### South Dakota Antitrust Claim

■ The South Dakota statute declares: "A contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful." S.D. Codified Laws § 37–1–3.1. The statutory language is ambiguous as to whether it is a part of the conspiracy or a part of the trade or commerce that must be within the state. Nevertheless, it is logical to assume that the state intended its antitrust coverage to be as broad as possible. Therefore, I conclude that the plaintiffs need only allege that a part of the trade or commerce occurred within South Dakota. The sales of motor vehicles in South Dakota satisfy this requirement.

Even if part of the conspiracy must occur within the state, the Second Amended Complaint contains sufficient allegations to survive a motion to dismiss. As with the Nevada antitrust claim, I read the Second Amended Complaint as alleging South Dakota dealers' participation in the conspiracy in an attempt to maintain high prices of motor vehicle sales in South Dakota. *See* Second Am. Compl. ¶¶ 39, 65. The motion to dismiss the South Dakota antitrust claim is therefore **DENIED**.

### Tennessee Antitrust Claim

■ The Tennessee Court of Appeals has recently analyzed the coverage of the Tennessee antitrust statute in great depth. *Sherwood v. Microsoft Corp.*, No. M2000–01850–COA–R9CV, 2003 WL 21780975 (Tenn.Ct.App.2003); *see also Freeman Indus. LLC v. Eastman Chem. Co.*, No. E2003–00527–COA–R9CV, 2004 WL 1102435, at *7 (Tenn.Ct.App. May 18, 2004), *appeal granted* E2003–000527–SC–S09–CV, 2004 Tenn. LEXIS 857 (Oct. 4,

---

9. *United Nuclear Corp. v. General Atomic Co.*, 96 N.M. 155, 629 P.2d 231, 270 (1980), does not support the defendants' contention that the reach of the New Mexico antitrust statute is limited to intrastate commerce. *United Nuclear* addressed the constitutionality of applying New Mexico's antitrust law to interstate commerce, and applied the standard established in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). *United Nuclear*, 629 P.2d at 270. According to this standard, state regulation is constitutional as long as the state has a "legit-imate local public interest" in the regulation and the regulation is evenhanded and only incidentally affects interstate commerce. *Id.* at 270–72. The defendants have not argued that the application of New Mexico's antitrust act in this case would unconstitutionally infringe on interstate commerce. Moreover, New Mexico has a legitimate local interest in the regulation of motor vehicle sales in the state, and the defendants have not suggested that the state law affects interstate commerce more than incidentally or that it is discriminatory in its application.

2004). I find the reasoning of *Sherwood* persuasive.[10] I therefore discount the earlier federal court interpretations of this aspect of Tennessee law in *In re Vitamins Antitrust Litigation*, No. MDL 1285, 2001 WL 849928 at *2 (D.D.C. Apr. 11, 2001); *FTC v. Mylan Laboratories, Inc.*, 62 F.Supp.2d 25, 51 (D.D.C.1999); and *FTC v. Mylan Laboratories, Inc.*, 99 F.Supp.2d 1, 9 (D.D.C.1999).

*Sherwood* held that indirect purchasers can recover damages under Tennessee antitrust law. 2003 WL 21780975, at *29. It also rejected any requirement that the illegal conduct "predominantly" affect intrastate commerce. *Id.* at *17. It concluded instead that "Tennessee's Trade Practices Act applies to illegal conduct that *substantially* affects commerce within this state."[11] *Id.* at *21 (emphasis added); *accord Freeman*, 2004 WL 1102435, at *6–7.

I conclude that the Second Amended Complaint here, with the reasonable inferences to be drawn from it, satisfies the *Sherwood* substantial-effects standard. The Second Amended Complaint's allegation of concerted action by dealers to increase new car prices necessarily implicates substantial effects on commerce within Tennessee. It is reasonable to infer that manufacturers wholesale their vehicles to dealers in Tennessee and make significant profits from Tennessee transactions. According to the Second Amended Complaint, retail prices throughout the country (thus including Tennessee) are higher as a result of the prohibition on importing Canadian cars. According to *Sherwood*, "the [Tennessee] legislature clearly intended that the Act apply to anticompetitive conduct that decreases competition in or increases the price of goods paid by consumers in Tennessee even though those goods may have arrived in Tennessee through interstate commerce." 2003 WL 21780975, at *16. The allegations here meet that standard. The motion to dismiss the Tennessee antitrust claim is therefore **Denied**.

### West Virginia Antitrust Claim

The defendants argue that West Virginia bars indirect purchasers from recovering damages. The West Virginia Antitrust Act does not explicitly address the issue, providing only that "[a]ny person who shall be injured in his business or property by reason of a violation of the provisions of this article may bring an action therefor." W. Va.Code § 47–18–9. The statute includes a harmonization provision, which directs that the Antitrust Act is to be construed "in harmony with ruling judicial interpretations of comparable federal antitrust statutes." *Id.* § 47–18–16. The same provision states that the law is to be construed "liberally." *Id.* Section 47–18–20 gives the West Virginia Attorney General authority to "make and adopt such rules and regulations as may be necessary for the enforcement and administration of [the Antitrust Act]." The Attorney General has issued a legislative rule providing that "[a]ny person who is injured directly or indirectly by reason of a violation of the

---

10. The Supreme Court of Tennessee has held that "[u]npublished intermediate court opinions have persuasive force," and noted that, "[u]nfortunately, many of the best opinions of our intermediate appellate courts are unpublished." *Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 n. 2 (Tenn.1991).

11. In doing so, the Tennessee Court of Appeals cogently explained the significance of the early case of *Standard Oil Co. v. State*, 117 Tenn. 618, 100 S.W. 705, 709 (1907), and its statements that Tennessee antitrust law, "when properly construed, does not apply to interstate commerce" and that "[t]he sole object and purpose of the enactment of it was to correct and prohibit abuses of trade within the state." *See Sherwood*, 2003 WL 21780975, at *9, *21.

West Virginia Antitrust Act may bring an action for damages." W. Va.Code St. R. § 142–9–2 (citation omitted). That rule was approved by the West Virginia legislature as part of omnibus legislation approving legislative rules on a variety of topics. S. 243, Reg. Sess., at 1023 (W.Va.1990) (enacted).

■ Under West Virginia Supreme Court precedent, a legislative rule approved by the legislature generally "has the force of a statute itself," and "is entitled to more than mere deference; it is entitled to controlling weight." *Boggess v. Workers' Comp. Div.*, 208 W.Va. 448, 541 S.E.2d 326, 330 (2000). But when a rule is approved, as here, only as part of omnibus legislation, it has no such effect and is subject to the analytical framework described in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *W. Va. Health Care Cost Review Auth. v. Boone Mem'l Hosp.*, 196 W.Va. 326, 472 S.E.2d 411, 420–23 (1996). Although the parties' memoranda do not address this particular issue, at oral argument the defendants argued that the West Virginia Attorney General's interpretation allowing indirect purchasers to recover is not entitled to deference. According to the defendants, the statutory harmonization provision requires that West Virginia recognize the *Illinois Brick* limitations on indirect purchaser recovery.

■ The West Virginia Supreme Court states that in reviewing an agency's legislative rule, a

> court must first ask whether the Legislature has directly spoken to the precise question at issue. If the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent. No deference is

due the agency's interpretation at this stage.

*Id.* at 422. I conclude that the West Virginia Legislature did not speak directly to whether indirect purchasers can recover state antitrust damages. The harmonization provision alone is not enough to amount to a direct statement, for harmonization is not as strict as the defendants would like. In Nebraska, for example, the antitrust statute requires that when any language in the state statute is "the same as or similar to the language of a federal antitrust law," Nebraska courts "shall follow the construction given to the federal law by the federal courts." Neb.Rev.Stat. § 59–829. Nevertheless, the Nebraska Supreme Court has held that indirect purchasers can recover damages under Nebraska antitrust law notwithstanding *Illinois Brick*. *Arthur v. Microsoft Corp.*, 267 Neb. 586, 676 N.W.2d 29, 37 (2004). Likewise, in Iowa, a harmonization provision has not prevented the Iowa Supreme Court from permitting damage recovery by indirect purchasers. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446–47 (Iowa 2002). The West Virginia harmonization principle (particularly in a sentence calling simultaneously for "liberal" construction) is simply not a direct statement prohibiting indirect purchaser recovery.

According to the West Virginia Supreme Court, if the legislative intent is not clear,

> the [next] question for the court is whether the agency's answer is based on a permissible construction of the statute. A valid legislative rule is entitled to substantial deference by the reviewing court. As a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory authority or [if the rule] is arbitrary or capricious.

*Boone Mem'l Hosp.*, 472 S.E.2d at 422. Here, I conclude that the Attorney General's legislative rule permitting indirect pur-

chasers to recover damages is based on a permissible construction of the statute (which is to be construed "liberally"). Cases from other states are divided ˋon whether state antitrust law is governed by *Illinois Brick* limitations where the state statute is silent. But allowing such recovery is certainly a "permissible construction." It is neither arbitrary nor capricious, and is therefore entitled to deference.[12] Accordingly, I conclude that West Virginia permits antitrust recovery by indirect purchasers. *See In re Terazosin Hydrochloride Antitrust Litig.*, 160 F.Supp.2d 1365, 1376 n. 8 (S.D.Fla.2001).

■ I also conclude that the Second Amended Complaint sufficiently alleges the necessary intrastate activity. Although the West Virginia statute, like the South Dakota statute, is not specific as to whether it is the commerce or the illegal conduct that must be inside the state,[13] I conclude that the allegations suffice for the reasons I discussed concerning South Dakota. *See Buscher v. Abbott Labs.*, No. 94–C–755, at 2 (W.Va.Cir.Ct. Jan. 27, 1994) (Pls.' Opp'n., Palmer Decl. Ex. A) ("Thus, the Antitrust Act prohibits a conspiracy that restrains West Virginia trade or commerce, regardless of the locus of the conspiracy.").[14] My conclusion is fortified by the fact that the monopoly section of West Virginia's antitrust statute covers a monopoly "any part of which is in this state." W. Va.Code § 47–18–4. The motion to dismiss the West Virginia antitrust claim is therefore **DENIED**.

### Wisconsin Antitrust Claim

The parties inform me that the Wisconsin Supreme Court currently has under review a case that may control the outcome of their arguments here on the scope of Wisconsin's antitrust statute. *See Olstad v. Microsoft Corp.*, 271 Wis.2d 113, 679 N.W.2d 548 (2004) (granting petition to certify). In the interests of judicial economy, I therefore **DENY** the motion to dismiss **WITHOUT PREJUDICE** to its renewal following the Wisconsin Supreme Court decision.

### (B) State Consumer Protection Statutes

The plaintiffs assert claims under the consumer protection statutes of thirty-nine states and the District of Columbia.[15] The defendants ask me to dismiss thirty-four of them.[16] The plaintiffs concede four of those.[17] That leaves thirty consumer protection statutes at issue.

12. Moreover, unlike the federal antitrust laws, West Virginia antitrust statutes do not provide for injunctive relief. Thus, if indirect purchasers cannot sue for damages, they have no recourse, not even the injunctive recourse available to indirect purchasers under federal law. That is hardly a "harmonization" outcome.

13. West Virginia Code section 47–18–3 provides: "[e]very contract ... or conspiracy in restraint of trade or commerce in this State shall be unlawful."

14. I recognize that this unpublished decision has limited authority under the law of West Virginia. *See State v. Myers*, 216 W.Va. 120, 602 S.E.2d 796, 802 n. 10 (2004). Nevertheless, "given the dearth of published opinions dealing with the issue before [me], [I] necessarily rely on [this] unpublished opinion[ ]." *Id.*

15. The plaintiffs make no consumer protection claim for Alabama, Florida, Hawaii, Indiana, Iowa. Kansas, Louisiana, Mississippi, South Carolina, Wisconsin and Wyoming.

16. The defendants state in a footnote that they "are moving to dismiss ... thirty-five of plaintiffs' forty consumer-protection claims." Defs.' Mot. at 1 n. 1. However, the text and exhibits to the defendants' motion to dismiss make arguments to dismiss only thirty-four of the plaintiffs' consumer protection claims. Defs.' Mot. at 7–17; *id.* Ex. A at 3.

17. ˍˍe plaintiffs concede Illinois, Oregon, Texas and Washington. Pls.' Opp'n App. C at 2.

The defendants assert a variety of reasons for dismissal, including failure to allege fraudulent or deceptive conduct, improperly using consumer protection statutes for what are really antitrust claims, lack of standing for indirect purchasers,[18] failure to allege intrastate conduct, some states' prohibition of consumer protection class actions,[19] preemption by federal and state regulation and failure to give prefiling notice of claims.

**(1) In General: For states whose consumer protection statutes prohibit only fraudulent or deceptive conduct, does the Second Amended Complaint contain sufficient allegations?**

Nowhere does the Second Amended Complaint specifically assert fraudulent or deceptive conduct.[20] Nor do the plaintiffs point to any fraud or deception in their legal memoranda.[21] Only at oral argument did the plaintiffs' lawyers specify what the deception was. There, they argued that the defendants' failure to inform consumers of the conspiracy to keep out Canadian cars had inflated new car prices in the United States. This omission or failure to disclose was material, they argued, because it deprived consumers of choice when purchasing vehicles.

The plaintiffs' late-articulated claim of deception by omission does not withstand scrutiny. The Second Amended Complaint charges that prices were lower in Canada and higher in the United States for the same vehicles. Second Am. Compl. ¶ 1. There is no assertion that this price differential was hidden from, or unknown to, consumers. On the contrary, the Second Amended Complaint details public aspects of the conspiracy's restriction on imports. Second Am. Compl. ¶ 51 (describing Canadian dealers' policy of requiring new car buyers to sign "No–Export" agreements), ¶ 55 (alleging refusal to honor warranties on cars imported from Canada), ¶ 65 (alleging refusal to convert speedometers and odometers from the metric system). For all that appears, if United States consumers failed to acquire the cheaper Canadian vehicles, it was because they did not care to, or because the alleged conspiracy prevented Canadian dealers from selling to them (or to a dis-

18. I do not address whether the plaintiffs' indirect purchaser status bars their claims in the District of Columbia, Idaho, Maine, Montana, New Hampshire, Utah and Vermont (jurisdictions for which I have denied the motion to dismiss) because the defendants have not argued that these jurisdictions impose a direct purchaser requirement.

19. The defendants argue that Georgia, Kentucky, Montana, New York, Ohio and Utah consumer protection statutes prohibit class actions. Defs.' Mot. at 15 n. 15. (In the context of the state antitrust claims, the defendants also contend that Mississippi prohibits class actions altogether. *Id.* at 4 n. 2.) I find these arguments premature because I have not yet been asked to rule on whether a class can be certified.

20. Paragraph 112 of the Second Amended Complaint states in a conclusory fashion that "[a]s a direct result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct. Plaintiffs and members of the Class were denied access to an alternative channel of distribution of new motor vehicles and forced to pay artificially high prices." However, there is no description anywhere of the "deception." The defendants do not challenge the Second Amended Complaint for failure to state allegations of fraud with particularity as required by Federal Rule of Civil Procedure 9(b).

21. The plaintiffs do say that the defendants "refused to honor ... warranties, disseminate safety recall information, or install properly calibrated odometers in the United States" for consumers who purchased vehicles in Canada. Pls.' Opp'n at 8; *see also* Second Am. Compl. ¶¶ 65–66. These allegations, however, do not involve deception.

count channel in the United States), not because the conspiracy was unknown. In other words, even if an American dealer had said to a consumer, "You know, this car costs more because we have conspired with the manufacturers to prevent Canadian cars from coming into the American market," the price would have remained the same (unless and until someone halted the alleged conspiracy). Perhaps the defendants' conduct was anticompetitive, a matter still to be determined; but the Second Amended Complaint cannot be read to assert that it was "fraudulent" or "deceptive," or that the "omission" was material to the consumer's decision to buy the vehicle at the price negotiated.[22]

### (2) Specific State Statutes

#### Arizona Consumer Protection Claim

■ The Arizona Consumer Fraud Act ("ACFA") prohibits

the act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby.

Ariz.Rev.Stat. § 44–1522(A). The Arizona Court of Appeals has held that an ACFA plaintiff must show "a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury." *Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 666 P.2d 83, 87 (1983); *see also Holeman v. Neils*, 803 F.Supp. 237, 242 (D.Ariz.1992) (citing *Dunlap*). By the statute's terms, an omission must be material. Ariz.Rev.Stat. § 44–1522A. As I have stated, the Second Amended Complaint, even as "amended" at oral argument, does not meet this standard.

The ACFA contains a permissive harmonization provision. It states: "It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1)." Ariz.Rev.Stat. § 44–1522(C). The plaintiffs contend that because antitrust violations and group boycotts are violations of the FTC Act, 15 U.S.C. §§ 41–58, the harmonization provision should yield the same result under the ACFA.[23] Pls.' Opp'n at 7–8; Pls.' Oral Argument Ex.

It is true that Arizona's harmonization provision allows Arizona judges to consider interpretations of the FTC Act. But it does not require that they follow those federal

---

**22.** The defendants correctly observe that "[i]f failure to disclose participation in a purported antitrust conspiracy were sufficient to state a consumer-protection claim, then *any* Section 1 antitrust case would automatically become a consumer-protection case. That is not the law." Defs.' Resp. to Pls.' Hr'g Submission at 5.

**23.** Harmonization provisions appear in both consumer protection and antitrust statutes. A harmonization provision in a state antitrust statute might narrow potential recovery to

direct purchasers, following the United States Supreme Court's interpretation of federal antitrust law in *Illinois Brick*. In contrast, a harmonization provision in a state consumer protection statute, which would harmonize the interpretation of the state statute with interpretations of the FTC Act, might allow for more expansive recovery to parallel the scope of the FTC Act's broad prohibitions on unfair methods of competition and unfair or deceptive acts. *See* 15 U.S.C. § 45(a)(1).

interpretations. *See* Ariz.Rev.Stat. § 44–1522(C); *see also* Mary Dee Pridgen, *Consumer Protection and the Law*, § 3:33 (2003) ("While the state courts have shown great deference to FTC decisions, they universally maintain that they are not *bound* by the FTC's interpretations."). Unlike the FTC Act, the Arizona statute does not include a prohibition on unfair methods of competition, and it does not prohibit unfair acts and practices in addition to deceptive acts and practices. *Compare* Ariz.Rev.Stat. § 44–1522(A) *with* 15 U.S.C. § 45(a). Following *Dunlap v. Jimmy GMC of Tucson, Inc.*, 666 P.2d at 87, I conclude that deception is required to state a claim under the ACFA.

The defendants' motion to dismiss the plaintiffs' claim under the Arizona Consumer Fraud Act is therefore GRANTED.

### Arkansas Consumer Protection Claim

 The Arkansas Deceptive Trade Practices Act ("ADTPA") forbids certain enumerated "[d]eceptive and unconscionable trade practices," as well as "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark.Code Ann. § 4–88–107(a). It also prohibits: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; [and] (2) The concealment, suppression, or omission of any material fact with the intent that others rely upon the concealment, suppression, or omission." *Id.* § 44–88–108. The ADTPA is not patterned directly on the FTC Act and does not contain a provision harmonizing its interpretation with that of the FTC Act. *See* Ark.Code Ann. §§ 4–88–101 to – 115; Pridgen, *supra*, § 3:5.

I have previously ruled that the plaintiffs do not allege any false or deceptive acts. I turn to whether the alleged conspiracy is "unconscionable." The ADTPA does not define the term "unconscionable." *See* Ark.Code Ann. §§ 4–88–101 to –115. In *Arkansas ex rel. Bryant v. R & A Investment Co.*, a case involving usurious contracts, the Supreme Court of Arkansas looked to contract law to define "unconscionable" under the ADTPA. The court stated that "[t]wo important considerations are whether there is a gross inequality of bargaining power between the parties to the contract and whether the aggrieved party was made aware of and comprehended the provision in question." 336 Ark. 289, 985 S.W.2d 299, 302 (1999). That contract law definition does not seem pertinent to evaluating an alleged antitrust conspiracy. I turn, therefore, to general definitions.[24] "Unconscionable" may be broadly defined as "showing no regard for conscience; affronting the sense of justice, decency, or reasonableness." *Black's Law Dictionary* 1561 (8th ed.2004); *cf.* Idaho Code § 48–603C(2)(d) (stating that one circumstance a court should consider when determining whether an act is unconscionable under the Idaho Consumer Protection Act is "[w]hether the sales conduct or pattern of sales conduct would outrage or offend the public conscience"). In the absence of any Arkansas caselaw to the contrary, I find that the plaintiffs' allegations of a conspiracy to keep Canadian cars out of the United States market are sufficient to state a claim of an unconscionable practice under the ADTPA.[25]

I find no support in the ADTPA or Arkansas caselaw for a ban on indirect

**24.** I do not look to the Uniform Consumer Sales Practices Act for guidance in interpreting the ADTPA because, although both statutes prohibit enumerated deceptive and unconscionable practices, the language of the two statutes differs considerably. *Compare*

Ark.Code Ann. § 4–88–107 *with* Unif. Consumer Sales Practices Act §§ 3–4.

**25.** *Little Rock Electrical Contractors v. Entergy Corp.*, 79 Ark.App. 337, 87 S.W.3d 842 (2002), cited by the defendants, does not support dismissal of the plaintiffs' ADTPA claim. That

purchaser suits. The ADTPA provides a private cause of action for damages for any person injured by a violation of the ADTPA, and is not limited to a cause of action for direct purchasers.[26] Ark.Code Ann. § 4–88–113(f). Arkansas also does not prohibit indirect purchaser suits under its antitrust laws. *See* Ark.Code Ann. §§ 4–75–201 to –320.

CADA and NADA are not exempt from the reach of the ADTPA. The ADTPA prohibits unconscionable, false or deceptive acts or practices "in business, commerce, or trade." Ark.Code Ann. § 4–88–107(a)(10). The statute does not define "business," "commerce" or "trade," but these terms are broad enough to encompass CADA's and NADA's activities, as alleged in paragraphs 2, 36 and 37 of the Second Amended Complaint. ADTPA liability is not limited to sellers of goods. *See* Ark.Code Ann. § 4–88–113(f) ("Any person who suffers actual damage or injury as a result of an offense or violation as

defined in this chapter has a cause of action to recover actual damages, if appropriate, and reasonable attorney's fees.").

The defendants' motion to dismiss the plaintiffs' Arkansas consumer protection claim is therefore **DENIED**.

### Colorado Consumer Protection Claim

■ The Colorado Consumer Protection Act ("CCPA") enumerates a list of behaviors prohibited as "deceptive trade practices." Colo.Rev.Stat. § 6–1–105.[27] The plaintiffs allege only that the defendants violated the catchall provision, section 6–1–105(u), which declares it a deceptive trade practice to:

> Fail[ ] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.

The Colorado Supreme Court has held that to establish a claim under the CCPA,

---

case involved a claim of deception, and the court did not comment on the types of behaviors that constitute "unconscionable practices" in violation of the ADTPA. *Id.* at 845–46.

26. *FTC v. Mylan Laboratories, Inc.,* 62 F.Supp.2d 25, 44 (D.D.C.1999) (*"Mylan I "*), cited by the defendants, does not support dismissal of these indirect purchaser claims. The court in *Mylan I* dismissed the Arkansas Attorney General's ADTPA claims brought on behalf of indirect purchasers for damages and restitution because the ADTPA did not expressly authorize such relief. *Id.* The court reconsidered that decision in *FTC v. Mylan Laboratories, Inc.,* 99 F.Supp.2d 1, 5 (D.D.C. 1999) (*"Mylan II "*), and reinstated the Arkansas Attorney General's claim for restitution on behalf of indirect purchasers. The *Mylan II* court did hold that the ADTPA does not allow the Attorney General to recover *damages* on behalf of indirect purchasers, *id.*, but it seems that the parties did not direct the court's attention to section 4–88–113(a)(2)(A) of the ADTPA, which permits the Attorney General

to seek "other damages sustained" by purchasers.

In any event, unlike *Mylan I* and *Mylan II*, this case is brought by individual indirect purchasers, rather than state attorneys general. The ADTPA explicitly authorizes a private cause of action for damages. Section 4–88–113(f) provides: "Any person who suffers actual damage or injury as a result of an offense or violation as defined in this chapter has a cause of action to recover actual damages, if appropriate, and reasonable attorney's fees." Ark.Code Ann. § 4–88–113(f). As noted above, the language of the ADTPA does not limit this cause of action to direct purchasers. *See id.*

27. The Colorado Consumer Protection Act is not patterned directly on the FTC Act and does not contain a harmonization provision. According to Professor Pridgen, Colorado "prohibit[s] only certain itemized practices, without a 'catch-all' prohibition against unspecified unfair or deceptive practices." Pridgen, *supra*, § 3:5 & n. 4.

a private plaintiff must show that "the challenged practice caused the plaintiff's injury." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo.2003) (quoting *Hall v. Walter*, 969 P.2d 224, 235 (Colo.1998)).[28] As I described at the outset, the Second Amended Complaint, even if amended by the plaintiffs' oral argument, does not allege fraudulent or deceptive conduct by the defendants, and certainly none that is material, *i.e.*, a deception that caused the plaintiffs' injury (overpayment).[29] Under the statute's plain language and the Colorado Supreme Court's interpretation, the plaintiffs' Colorado Consumer Protection claim must be DISMISSED.[30]

### Connecticut Consumer Protection Claim

■ In *Vacco v. Microsoft Corp.*, 260 Conn. 59, 793 A.2d 1048 (2002), the Con-necticut Supreme Court concluded that an indirect purchaser (there an end-user licensee of computer software) lacked standing to sue a software manufacturer under the Connecticut Unfair Trade Practices Act ("CUTPA"). In arriving at that conclusion, the court applied the following "three part policy analysis" to determine whether an indirect purchaser has standing to sue:

> First, the more indirect an injury is, the more difficult it becomes to determine the amount of [the] plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries. Third, struggling

---

**28.** I observe that both *Hall*, 969 P.2d at 234, and *Rhino Linings*, 62 P.3d at 148, state that one element of the five-element standard for bringing a private action under the CCPA is a showing "that the defendant engaged in an *unfair* or deceptive trade practice." Emphasis added. Likewise, the court in *U.S. West, Inc. v. Business Discount Plan, Inc.*, 196 F.R.D. 576, 591 (D.Colo.2000), noted that the CCPA prohibits " 'unfair trade practices' as defined in C.R.S. § 6–1–105." Although the word "unfair" appears in these decisions, I have found no Colorado case where the court applied the term substantively to broaden the CCPA's reach to unfair, in addition to deceptive, practices. *Hall* adopted the five-element test, including the "unfair" language, from the Supreme Court of Washington. *See Hall*, 969 P.2d at 234 (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 719 P.2d 531 (1986)). The Supreme Court of Washington developed the standard based on Washington's consumer protection act, which, unlike the CCPA, broadly prohibits, in language closely tracking the FTC Act, "[u]nfair methods of competition and unfair or deceptive acts or practices," Wash. Rev.Code § 19.86.020. I also note that Colorado has a separate statute reg-ulating unfair practices, Colo.Rev.Stat. §§ 6–2–101 to –117, labeled the "Unfair Practices Act." It is devoted to discriminatory and below-cost pricing and is not at issue here.

**29.** The plaintiffs also have not alleged that the withholding of information about the conspiracy "was intended to induce the consumer to enter into a transaction," another requirement of subsection (u).

**30.** The plaintiffs' reliance on *U.S. West*, 196 F.R.D. at 591, and *May Department Stores Co. v. Colorado*, 863 P.2d 967 (Colo.1993), in support of their Colorado consumer protection claim is misplaced because neither case addresses the issue whether a plaintiff must allege fraudulent or deceptive conduct to establish a CCPA claim. The issue addressed in *U.S. West* was whether the plaintiff had alleged an injury resulting from the defendant's alleged consumer protection violations. 196 F.R.D. at 591. In *May*, the Supreme Court of Colorado reviewed the civil penalties imposed by the lower courts in a case where the trial court had found that the defendant engaged in deceptive practices in violation of the CCPA. 863 P.2d at 971.

with the first two problems is unnecessary when there are directly injured parties who can remedy the harm without these attendant problems.

*Id.* at 1066.

The last two factors of the analytical framework described in *Vacco* weigh strongly against the plaintiffs here. Recognizing CUTPA claims by these buyers could well lead to duplicative recoveries. It would undoubtedly produce complicated damages apportionment issues. I referred to these problems in ruling that the plaintiffs, as indirect purchasers, could not recover damages under their federal antitrust claims.[31] *In re New Motor Vehicles Canadian Exp. Antitrust Litig.,* 307 F.Supp.2d 136, 140–41. Moreover, "there are directly injured parties who can remedy the harm without these attendant problems." *See Vacco,* 793 A.2d at 1066. American and Canadian automobile dealers and would-be discount distributors are all directly injured parties who could sue without creating these duplicative recovery problems. As to the first factor, remoteness, these plaintiffs are one step closer to the defendants than the plaintiff in *Vacco* was to the defendant software manufacturer. (In that case, the software manufac-

turer charged computer manufacturers who charged retailers who charged the plaintiff.) Nevertheless, there will certainly be difficult issues in determining to what degree the manufacturers' conduct affected the dealers' ultimate retail pricing decisions.

I conclude that the defendants' motion to dismiss the plaintiffs' CUTPA claim must be GRANTED.

### Delaware Consumer Protection Claim

■ The Delaware Consumer Fraud Act ("DCFA") prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise."[32] Del.Code. Ann. tit. 6, § 2513(a). Because the Delaware statute requires deception or omission of a material fact, allegations of which I have found missing in the Second Amended Complaint, the defendants' motion to dismiss must be GRANTED. *See McDuffy v. Koval,* 226 F.Supp.2d 541, 547 (D.Del.2002) (granting summary judgment in favor of the defendants based on the plaintiffs' fail-

---

**31.** Multiple recovery problems exist because the alleged conspiracy could have harmed the dealers by preventing them from buying and selling the less-expensive Canadian vehicles. *See In re New Motor Vehicles,* 307 F.Supp.2d at 140; Second Am. Compl. ¶ 44. Even if the dealers participated in the conspiracy, as the plaintiffs allege, the dealers may sue the defendant automobile companies so long as the dealers are not parties to this lawsuit. *See In re New Motor Vehicles,* 307 F.Supp.2d at 140. Discount distributors who would otherwise buy vehicles in Canada and sell them to United States consumers may also be able to recover. *Id.* at 142. Additionally, Canadian dealers may have a cause of action against the defendants because the conspiracy and its attendant restrictions on Canadian dealers may have restricted their customer base. *Id.*

**32.** The DCFA does not track the language of the FTC Act prohibiting unfair competition and unfair acts, nor does it contain a provision harmonizing the DCFA with the FTC Act. *See* Del.Code Ann. tit. 6, §§ 2511 to 2527. The plaintiffs have not specified whether they are bringing their Delaware consumer protection claim under Delaware's Consumer Fraud Act, Del.Code Ann. tit. 6, §§ 2511 to 2531, or Deceptive Trade Practices Act, Del.Code Ann. tit. 6, §§ 2532 to 2536. *See* Second Compl. ¶ 119 (citing only "6 Del.Code § 2511, *et seq.*"). In any event, I note that the plaintiffs fail to state a claim under the Deceptive Trade Practices Act, which prohibits only enumerated deceptive trade practices, none of which encompasses the plaintiffs' allegations.

ure to allege fraudulent behavior in support of their DCFA claim); *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 66 (Del.1993) (noting that the DCFA provides consumers with an implied private cause of action to recover for injuries caused by merchants' fraud or deception). I need not address whether the plaintiffs allege sufficient Delaware conduct by the defendants.[33]

### District of Columbia Consumer Protection Claim

The defendants' motion to dismiss the District of Columbia ("D.C.") consumer protection claim against the dealer associations, CADA and NADA, is GRANTED. D.C.'s highest court has ruled that the D.C. Consumer Protection Procedures Act ("DCCPPA")

> clearly contemplates complaints against "merchants" who "supply the goods or services which are or would be the subject matter of a trade practice." While a "merchant" is not limited to the actual seller of the goods or services complained of, he must be a "person" connected with the "supply" side of a consumer transaction.

*Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C.Ct.App.1981) (citation omitted). The Second Amended Complaint does not allege that these dealer associations had any merchant-consumer relationship with the consumer plaintiffs.[34]

As for the automobile companies, the DCCPPA contains a long list of actions that constitute "unlawful trade practices," almost all of them having to do with deception. D.C.Code Ann. § 28–3904. I have already explained that the Second Amended Complaint does not adequately allege deception. In fact, the plaintiffs' allegations do not approximate any of the "unlawful trade practices" listed in section 28–3904.

D.C.'s highest court, however, has interpreted the statute more broadly:

> The Consumer Protection Procedures Act is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers. While the [DCCPPA] enumerates a number of specific unlawful trade practices, the enumeration is not exclusive. A main purpose of the [DCCPPA] is to assure that a just mechanism exists to remedy *all* improper trade practices. Trade practices that violate other laws, including the common law, also fall within the purview of the [DCCPPA].

---

33. The DCFA states that its purpose is "to protect consumers ... from unfair or deceptive merchandising practices in the conduct of any trade or commerce *in part or wholly within this State.*" Del.Code Ann. tit. 6, § 2512 (emphasis added). The Court of Chancery of Delaware has held that "relief can be granted under the DCFA only as to those unlawful practices occurring or performed partly or wholly within Delaware." *Goodrich v. E.F. Hutton Group, Inc.*, 542 A.2d 1200, 1203 (Del.Ch.1988). Apparently, the offending conduct itself (not merely the trade or commerce) must occur in Delaware.

34. The plaintiffs allege that CADA and NADA represent Canadian and United States new motor vehicle dealers, and that NADA acts as the "eyes, ears, and voice of franchised car and truck dealers in the nation's capitol, developing positions that are presented as the collective view of dealers to Congress, courts, federal agencies and the public." Second Am. Compl. ¶¶ 36–37 (quotations omitted). The plaintiffs allege that CADA and NADA facilitated communication about the conspiracy, helped the manufacturers enforce the conspiracy and promoted the creation of a list of practices that Canadian dealers could use to stop export sales. *Id.* ¶ 2. These allegations, if true, show only that CADA and NADA worked with the dealers in a representative capacity, not that they were connected to the "supply side" of the consumer transaction.

*Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 722–23 (D.C.2003) (internal quotation marks and citations omitted). In *Bassin*, the court permitted cable subscribers to use the DCCPPA to seek relief for an excessive late payment penalty. *Id.* at 723. The court did not premise the subscribers' right to proceed upon the basis of fraud or deception. Instead, the court permitted subscribers to recover compensatory and treble damages because the late payment penalty did not meet common-law standards for a liquidated damages clause. *Id.* at 724–25. Since *Bassin* declares that the DCCPPA can be used as a remedy for improper trade practices that violate other laws, the statute is broad enough to cover the alleged illegal conspiracy here.[35] Given the D.C. court's flexible and broad interpretation of the DCCPPA, the defendants' motion to dismiss the plaintiffs' D.C. consumer protection claim against the automobile companies must be **DENIED**.[36]

### *Georgia Consumer Protection Claim*

■ Georgia's Fair Business Practices Act ("GFBPA") requires that a plaintiff deliver to any prospective defendant a written demand "identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered" at least thirty days before filing a GFBPA claim. Ga.Code Ann. § 10–1–399(b). Here, the plaintiffs

---

**35.** The statute also directs that it "shall be construed and applied liberally to promote its purpose." D.C.Code Ann. § 28–3901(c), and states that one of its purposes is to "assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices," *id.* § 28–3901(b)(1).

**36.** The United States District Court for the District of Columbia has applied the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) to allegations of deceptive trade practices under the DCCPPA.

maintain that their earlier antitrust complaints initially filed across the country and the subsequent Consolidated Amended Complaint filed in this Court satisfy this notice requirement. Pls.' Opp'n at 12. Although the notice requirement "must be liberally construed," *Stringer v. Bugg*, 254 Ga.App. 745, 563 S.E.2d 447, 449 (2002), and "[i]t is well-settled [that] the question of sufficiency of notice is one for the court," *Sharpe v. Gen. Motors Corp.*, 198 Ga.App. 313, 401 S.E.2d 328, 329 (1991), I reject the plaintiffs' argument. The statute requires written notice at least thirty days "prior to the filing of any such action." Ga.Code Ann. § 10–1–399(b). The procedure presumably is designed to encourage settlement and to avoid unnecessary lawsuits. *See id.* To hold that a complaint filed in court suffices as notice if it is later amended to add a consumer protection claim flies in the face of both the statutory language and its policy. (I do not reach the question of whether the filing of an antitrust lawsuit can constitute notice of a potential consumer protection claim.) The motion to dismiss the Georgia consumer protection claim is **GRANTED WITHOUT PREJUDICE**.

### *Idaho Consumer Protection Claim*

■ The defendants' motion to dismiss the Idaho consumer protection claim against CADA and NADA is **GRANTED**.

---

*Witherspoon v. Philip Morris, Inc.*, 964 F.Supp. 455, 463–64 (D.D.C.1997). Although the plaintiffs have not met this heightened pleading standard with regard to their argument that the failure to reveal the conspiracy constituted a deceptive practice, the defendants have not raised the issue. Moreover, given the D.C. court's broad interpretations of the DCCPPA. I conclude that the alleged antitrust violation may violate the DCCPPA without being a deceptive practice, the criterion that triggers the Rule 9(b) pleading requirements.

The Idaho Consumer Protection Act ("ICPA") forbids "unfair methods of competition and unfair or deceptive acts or practices," Idaho Code § 48–603, as well as "unconscionable method[s], act[s] or practice[s]," *id.* § 48–603C, "in the conduct of any trade or commerce," *id.* §§ 48–603, 48–603C. " 'Trade' and 'commerce' " are defined as "advertising, offering for sale, selling, leasing, renting, collecting debts arising out of the sale or lease of goods or distributing goods or services, either to or from locations within the state of Idaho, or directly or indirectly affecting the people of this state." *Id.* § 48–602(2). The ICPA further defines "services" as "work, labor or any other act or practice provided or performed by a seller *to or on behalf of a consumer.*" *Id.* § 48–602(7) (emphasis added). The plaintiffs allege that CADA and NADA provided services to automobile dealers, Second Am. Compl. ¶¶ 36–37, but do not allege that CADA and NADA provided services to or on behalf of consumers. The plaintiffs therefore cannot maintain their Idaho consumer protection claim against CADA and NADA.

 Regarding the automobile companies, Idaho Code section 48–603 enumerates prohibited unfair methods of competition and unfair or deceptive acts or practices, and includes a catchall provision forbidding "[e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer," *id.* § 48–603(17). The Second Amended Complaint does not allege any of the prohibited practices listed in the ICPA, and does not otherwise allege a misleading, false or deceptive act.

The ICPA also prohibits "[a]ny unconscionable method, act or practice in the conduct of any trade or commerce." *Id.* §§ 48–603C(1); 48–603(18). Section 48–603(c)(2) lists four "circumstances" to guide courts in determining whether a

challenged behavior is unconscionable: first, whether the defendant took advantage of a consumer who was unable to protect his or her own interests; second, whether the defendant knew that the price "grossly exceeded" market value; third, whether the "transaction ... was excessively one-sided in favor of the alleged violator"; and finally, whether the conduct "would outrage or offend the public conscience, as determined by the court." Allegations as to the second and fourth "circumstances" may be inferred from the Second Amended Complaint. There, the plaintiffs allege that prices for new motor vehicles in the United States are ten to thirty percent greater than prices for the same vehicles in Canada, and that the defendants were aware of and attempted to maintain this potentially gross price disparity by conspiring to keep Canadian vehicles out of the United States. Second Am. Compl. ¶ 1. It is reasonable to infer that the defendants' alleged attempts to prevent this competition "would outrage or offend the public conscience."

Although the ICPA is not modeled directly on the FTC Act, Idaho Code section 48–604(1) instructs courts to give "due consideration and great weight ... to the interpretation of the federal trade commission and the federal courts relating to section 59(a)(1) of the federal trade commission act (15 U.S.C. § 45(a)(1))." The FTC Act prohibits antitrust violations, *see FTC v. Cement Inst.*, 333 U.S. 683, 694, 68 S.Ct. 793, 92 L.Ed. 1010 (1948), and the plaintiffs have characterized the alleged conspiracy here as a group boycott in violation of the Sherman Act, *see* Second Am. Compl. ¶ 3. The Supreme Court of Idaho has directed courts to construe the ICPA liberally in light of the legislative intent "to deter deceptive or unfair trade practices and to provide relief for consumers exposed to proscribed practices." *State ex*

*rel. Lance v. Hobby Horse Ranch Tractor and Equip. Co.,* 129 Idaho 565, 929 P.2d 741, 743 (1996).

In light of allegations satisfying some of the circumstances for finding unconscionable acts under the ICPA, the persuasive guidance from the FTC Act's prohibition on antitrust violations and the Supreme Court of Idaho's directive to interpret the ICPA liberally, I DENY the automobile company defendants' motion to dismiss the Idaho consumer protection claim.

### Kentucky Consumer Protection Claims

Two sections of Kentucky's Consumer Protection Act ("KCPA") and a separate remedies provision are at stake. I deal with them separately.

#### Section 367.170

■ In section 367.170, the KCPA forbids "unfair, false, misleading, or deceptive acts or unfair practices." But as indirect purchasers, the plaintiffs cannot maintain their claim against the automobile companies or dealer associations. Under section 367.170, a consumer "may not maintain a private action against a seller with whom he did not deal or who made no warranty for the benefit of the subsequent purchaser," because the statutory language "plainly contemplates an action by a purchaser against his immediate seller." *Skilcraft Sheetmetal, Inc. v. Ky. Mach., Inc.,* 836 S.W.2d 907, 909 (Ky.Ct.App.1992); *see also Ky. Laborers Dist. Council Health & Wel-*

*fare Trust Fund v. Hill & Knowlton, Inc.,* 24 F.Supp.2d 755, 772–73 (W.D.Ky.1998) (citing *Skilcraft* ). The automobile companies and dealer associations did not deal with the plaintiffs nor did they make any relevant warranties for the plaintiffs' benefit. The plaintiffs' indirect purchaser status thus bars suit under section 367.170 of the KCPA.

#### Section 367.175

Kentucky's antitrust provision, Ky.Rev. Stat. Ann. § 367.175, is included within the KCPA.[37] Because section 367.175 is a penal statute with no private cause of action, however, I turn to section 446.070, the remedies provision, to see if this claim can survive the motion to dismiss.[38]

#### Section 446.070

■ Section 446.070 provides "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." Ky.Rev. Stat. Ann. § 446.070. To recover under section 446.070 for a violation of section 367.175, the plaintiffs must show that the violation of section 367.175 proximately caused their injuries, *see Shields v. Booles,* 238 Ky. 673, 38 S.W.2d 677, 681 (1931) (cited in *Kentucky Laborers,* 24 F.Supp.2d at 774), and that they are in the class of persons intended to be protected by section 367.175, *Kentucky Laborers,* 24

---

**37.** The plaintiffs did not include Kentucky in the state antitrust count of the Second Amended Complaint. But the exhibit introduced by the plaintiffs at oral argument argues that under *Kentucky Laborers,* 24 F.Supp.2d 755, the plaintiffs should be able to assert an antitrust violation under section 367.175. Pls.' Oral Argument Ex. The defendants did not address this argument in their response to the plaintiffs' hearing submission. *See* Defs.' Response to Pls.' Hr'g Submission (Docket Item 154).

**38.** Because the Kentucky Supreme Court has held that the application of section 446.070 is "limited to where the statute is penal in nature, or where by its terms the statute does not prescribe the remedy for its violation," *Grzyb v. Evans,* 700 S.W.2d 399, 401 (Ky. 1985), section 466.070 may be applied to violations of the antitrust provision (section 367.175), but not to violations of the consumer protection provision (section 367.170).

F.Supp.2d at 774; *State Farm Mut. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988). As indirect purchasers, the plaintiffs cannot meet these criteria for their antitrust injury.[39]

The motion to dismiss the Kentucky consumer protection claims against all the defendants is therefore **GRANTED**.

### Maine Consumer Protection Claim

#### Prefiling Notice

■ Under Maine's Unfair Trade Practices Act, a prospective plaintiff must deliver to the prospective defendant "a written demand for relief, identifying the claimant and reasonably describing the unfair and deceptive act or practice relied upon and the injuries suffered" at least thirty days before filing an action. 5 M.R.S.A. § 213(1–A). However, the Maine Law Court has held that "the notice requirements of section 213(1–A) are not jurisdictional." *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc.*, 659 A.2d 267, 273 (Me.1995). Thus, the plaintiffs' failure to comply with the express terms of the notice requirement does not bar their Maine consumer protection claim, although there may be other consequences (such as a cessation of litigation for the thirty-day period, if requested, or a denial of attorney fees and costs). *See id.*

#### Fraudulent or Deceptive Conduct

Maine forbids "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S.A. § 207. I have already explained that the Second Amended Complaint does not sufficiently allege deception, but Maine's Unfair Trade Practices Act also prohibits unfair methods of competition and is modeled on the FTC Act. *See* Pridgen, *supra*, § 3:5. The Maine statute also contains a provision directing courts to interpret it in harmony with the FTC Act, 5 M.R.S.A. § 207(1), and the Maine Law Court examines federal precedent in interpreting it. *Tungate v. MacLean–Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me.1998).

■ The Second Amended Complaint characterizes the alleged conspiracy as a group boycott. Second Am. Compl. ¶ 3. A group boycott is an agreement by competitors "not to deal with, or to deal only on specified terms with, other economic actors." ABA Section of Antitrust Law, *Antitrust Law Developments* 104 (5th ed.2002). Group boycotts violate the Sherman Act and the FTC Act's prohibition on unfair methods of competition. *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (describing the defendants' boycott as a "classic restraint of trade" under the Sherman Act and as such, an unfair method of competition under section five of the FTC Act); *see also Cement Inst.*, 333 U.S. at 694, 68 S.Ct. 793 (stating that the same conduct may violate both the Sherman Act and the FTC Act). There are no

---

**39.** *See Arnold v. Microsoft Corp.*, 2001 WL 1835377 at *7 (Ky.App.2001) (indirect purchasers cannot bring suit for a violation of section 367.175 of the KCPA); *In re Microsoft Corp. Antitrust Litig.*, 241 F.Supp.2d 563, 565 (D.Md.2003) (indirect purchasers cannot sue for antitrust violations under the KCPA) (citing *Arnold*, 2001 WL 1835377). The *Arnold* decision is unpublished and thus has limited precedential value in Kentucky, *see* Ky. R. Civ. P. 76.28(4)(C), but it is the only Kentucky

guidance available. (The defendants also cite *Potter v. Bruce Walters Ford Sales, Inc.*, 37 S.W.3d 210, 213 (Ky.Ct.App.2000), in support of a direct purchaser requirement under the KCPA Defs.' Reply Ex. B, App. IIR, at 2. The court in *Potter* addressed the privity requirement under section 367.170, which I discussed above, but did not address indirect purchaser standing for a claim under section 367.175. 37 S.W.3d at 213.)

Maine cases directly on point but, because the Maine statute and the Maine Law Court both direct courts to look to federal precedent, the alleged conspiracy, as a potential violation of the FTC Act, could violate the state prohibition on "unfair methods of competition." [40] *See* 5 M.R.S.A. § 207; *Tungate,* 714 A.2d at 797. Thus, the plaintiffs' allegations of a conspiracy to keep Canadian vehicles out of the United States, if true, could constitute a violation of Maine's Unfair Trade Practices Act.

### CADA and NADA

■ The Maine statute permits a person who buys "services ... primarily for personal, family or household purposes" to sue for loss caused by another person's use "of a method, act or practice declared unlawful by section 207." 5 M.R.S.A. § 213. CADA and NADA point out that the Second Amended Complaint does not allege that they "have engaged in any trade with consumers." Defs.' Mot. at 7 n. 6. I turn to section 207, therefore, to determine whether its prohibition is limited to those who engage directly in consumer transactions. Section 207 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S.A. § 207. It does not limit the scope of its prohibition to consumer transactions.[41] (Obviously, the plaintiffs will still have to

prove causation between CADA's and NADA's activities and the plaintiffs' alleged consumer injuries.)

The defendants' motion to dismiss the Maine consumer protection claims is therefore DENIED.

### Maryland Consumer Protection

■ The Maryland Consumer Protection Act ("MCPA") forbids any "unfair or deceptive trade practice," Md.Code Ann., Com. Law, § 13–303, and provides a nonexclusive list of prohibited acts, *id.* § 13–301. Subsection 9 of Section 13–301 prohibits "knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with ... [t]he promotion or sale of any consumer goods." I have previously explained that the Second Amended Complaint, even if amended by the plaintiffs' oral argument, does not adequately allege deception or material omission.

As for the term "unfair," the MCPA also declares that "[i]t is the intent of the General Assembly that in construing the term 'unfair or deceptive trade practices', due consideration and weight be given to the interpretations of § 5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and the federal courts." [42] *Id.* § 13–105. A purpose of section 13–105 is to "achieve a fair comparability between what the FTC and [the

---

**40.** The defendants contend that, according to *Tungate v. MacLean–Stevens Studios, Inc.,* 714 A.2d 792, 797 (Me.1998), "in pricing cases under the Act the inquiry is whether the price has the effect of deceiving the consumer." Defs.' Mot.App. I.A at 3. The issue in *Tungate* was whether an undisclosed commission was an unfair or deceptive act. *Tungate,* 714 A.2d at 797. The relevant provision in this case is not the prohibition on "unfair or deceptive acts," but rather the ban on "unfair methods of competition," which was not implicated in *Tungate.* *Tungate's* standards for establishing deception are therefore not pertinent.

**41.** The defendants have not argued that they do not advertise, offer, sell or distribute services, the relevant statutory definition of "trade or commerce." 5 M.R.S.A. § 206(3).

**42.** The language of the MCPA does not follow the FTC Act. *See Pridgen, supra,* § 3:5. The MCPA forbids only unfair and deceptive acts, and does not include the FTC Act's prohibition on "unfair methods of competition." *Compare* Md.Code Ann., Com. Law II, § 13–301 *with* 15 U.S.C. § 45(a).

Maryland Consumer Protection Division] consider to be unfair or deceptive, absent some clear Maryland policy that dictates a different conclusion." *Luskin's, Inc. v. Consumer Prot. Div.*, 353 Md. 335, 726 A.2d 702, 711 (1999). However, the MCPA proscription of unfair and deceptive acts does not include antitrust violations, because the unfair or deceptive trade practices prohibited by the MCPA "do not include monopolistic conduct or other violations of [the Maryland Antitrust Act]." *Davidson v. Microsoft Corp.*, 143 Md.App. 43, 792 A.2d 336, 345 (2002) (quoting *In re Microsoft*, 127 F.Supp.2d 702, 724 n. 25 (D.Md.2001)) (internal quotations omitted). The conspiracy the plaintiffs allege here is a potential violation of the Maryland Antitrust Act, Md.Code Ann., Com. Law, § 11–204(a)(1), a statute separate from the MCPA. Therefore, the alleged conspiracy does not constitute a violation of the MCPA, despite the provision harmonizing the FTC Act and the MCPA. The defendants' motion to dismiss the Maryland consumer protection claim is GRANTED.

### Massachusetts Consumer Protection Claim

▇ At least thirty days before filing an action under the Massachusetts consumer protection statute, consumer plaintiffs must mail or deliver to any prospective defendant "a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered." Mass. Gen. Laws ch. 93A, § 9(3) ("chapter 93A"). The Supreme Judicial Court of Massachusetts has "often held that '[a] demand letter listing the specific deceptive practices claimed is a prerequisite to [a chapter 93A] suit and as a *special element must be alleged and proved.*'" *Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 475 N.E.2d 727, 735 (1984) (quoting *Entrialgo v. Twin City Dodge*, 368 Mass. 812, 333 N.E.2d 202, 204 (1975)); *see also City of Boston v. Aetna Life Ins. Co.*, 399 Mass. 569, 506 N.E.2d 106, 109 (1987) ("The failure of the City to allege the sending of a demand letter is fatal to its [chapter 93A] claim.").

Contrary to the plaintiffs' assertion, Pls.' Opp'n at 12, the initial complaints filed across the country and the Amended Complaint filed in this Court almost seven months prior to the filing of the Second Amended Complaint cannot "effectively act as the required notice." [43] The pur-

---

**43.** The plaintiffs' reliance on *Towne v. North End Isuzu, Inc.*, No. 982708B, 1999 WL 674140 (Mass.Super. June 21, 1999) (*"Towne II"*) (cited in Pls.' Opp'n at 12–13), to support this contention is inapposite. The court in *Towne II* noted that in *Towne v. North End Isuzu, Inc.*, No. 98–0895A (Worcester Sup.Ct.) (*"Towne I"*), the Worcester Superior Court denied the plaintiffs' request to amend the complaint after the plaintiffs sent the required demand letter, so the plaintiffs filed a new action including the chapter 93A claim. *Id.* at *1. The court in *Towne II* held that although the ruling of *Towne I* precluded the plaintiffs from amending their complaint, the plaintiffs could file a separate chapter 93A complaint *after sending the required letter. Id.* at *2. This case is also unlike *Latino v. Ford Motor Co.*, 403 Mass. 247, 526 N.E.2d 1282,

1284 (1988), where the court held that Massachusetts General Laws chapter 90, section 7N 1/2 ("section 7N 1/2") allowed a state-certified arbitration award to serve the purpose of the written demand required under chapter 93A. A violation of section 7N 1/2 also violates chapter 93A, and section 7N 1/2 expressly provides that "[f]or the purposes of [chapter 93A], the timely delivery by a manufacturer of a refund or acceptable replacement, pursuant to a finding by state-certified arbitration, shall constitute the granting of relief upon demand." Mass. Gen. Laws ch. 90, § 7N 1/2 (7). The court in *Latino* interpreted this provision to permit the arbitration award to serve as the "statutorily designated equivalent of a [chapter] 93A demand letter" when the manufacturer did not provide the required relief. 526 N.E.2d at 1284. The plaintiffs have not

poses of the demand letter are to encourage settlement and to limit the damages the plaintiff can recover to any reasonable settlement offer that was tendered in response to the demand letter and rejected by the plaintiff. *See* Mass. Gen. Laws ch. 93A, § 9(3); *Spring,* 475 N.E.2d at 736. The plaintiffs' complaints prior to the Second Amended Complaint do not comply with the plain language of the demand requirement of chapter 93A, nor do they foster settlement or potentially limit the plaintiffs' relief. The motion to dismiss the plaintiffs' chapter 93A claim is therefore GRANTED WITHOUT PREJUDICE because the plaintiffs have not alleged that they delivered the required demand letter to the defendants. *See McMahon v. Digital Equip. Corp.,* 944 F.Supp. 70, 77 (D.Mass. 1996) (dismissing the plaintiff's chapter 93A claim for failure to allege that she sent the thirty-day demand letter).

### *Michigan Consumer Protection Claim*

 ▬ The Michigan Consumer Protection Act ("MICPA") forbids only itemized "[u]nfair, unconscionable, or deceptive methods, acts or practices." Mich. Comp. Laws § 445.903(1). The MICPA does not contain a harmonization provision, *see* Mich. Comp. Laws §§ 445.901–.921, and is not modeled directly on the FTC Act, *compare* Mich. Comp. Laws §§ 445.901–.921 *with* 15 U.S.C. § 45. The plaintiffs argued in their oral argument hearing exhibit that the MICPA should be liberally construed to achieve its intended purpose of prohibiting unfair practices in trade or commerce, citing *Forton v. Laszar,* 239 Mich.App. 711, 609 N.W.2d 850, 853 (2000). Although the MICPA does prohibit unfair practices, the proscribed practices are limited to those itemized in the statute, as recognized by the court in *Forton. See id.* ("The [MICPA] prohibits, *and defines by example,* '[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.'") (quoting Mich. Comp. Laws § 445.903(1)) (emphasis added). The plaintiffs' allegations do not fit any of the MICPA's itemized proscribed practices. *See* Mich. Comp. Laws § 445.903(1). Most of the listed unlawful practices involve deception, *see id.,* which, as I previously explained, the plaintiffs have failed to allege. The plaintiffs' allegations do not resemble any of the other listed unlawful practices, and the plaintiffs do not claim that they do.[44] Consequently, the motion to dismiss the Michigan claim as to all the defendants is GRANTED.

### *Minnesota Consumer Protection Claim*

The plaintiffs have failed to state a claim under the applicable Minnesota consumer protection statutes.[45] Minnesota's Uni-

cited and I am not aware of any such statutory provision authorizing the use of a previous complaint to fulfill the chapter 93A demand requirement.

**44.** The only itemized violation that possibly relates to the plaintiffs' allegations is the prohibition on "[c]harging the consumer a price that is grossly in excess of the price at which similar property or services are sold." Mich. Comp. Laws § 445.903(1)(z). The plaintiffs, however, have not argued that the defendants' alleged practices violate this provision. Even if the plaintiffs had made this argument, the applicability of this provision is questionable given that it was the dealers, and not the

defendant automobile companies, who charged the plaintiffs allegedly inflated prices for motor vehicles.

**45.** It is unclear which Minnesota statute provides the basis for the plaintiffs' Minnesota consumer protection claim. In paragraph 129 of their Second Amended Complaint, the plaintiffs cite "Minn.Stat. § 8.31, *et seq.*" Section 8.31 delineates the rights and duties of the attorney general and provides a private right of action for a violation of various statutes including the unfair discrimination and competition statute, Minn.Stat. §§ 325D.01.07; the Unlawful Trade Practices Act, Minn.Stat. §§ 325D.09.16; the antitrust

form Deceptive Trade Practices Act prohibits a variety of acts, but all involve deception or misrepresentation. *See* Minn.Stat. §§ 325D.43–.48. Likewise, the Minnesota Prevention of Consumer Fraud Act proscribes "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon." Minn.Stat. § 325F.69(1). As I have already explained, the Second Amended Complaint even as "amended" at oral argument does not state a deception or material omission claim.[46] Indeed, a Minnesota court in a parallel action involving the same alleged anticompetitive behavior dismissed a Minnesota consumer fraud claim. *Lerfald v. Gen. Motors Corp.,* Court File No. CT 03–003327 (Minn.Dist.Ct. Nov. 7, 2003) (Defs.' Mot. Ex. D). In the Minnesota case, the plaintiffs contended that it was deceptive to state a price for a car while knowing that the conspiracy maintained prices at an artificially high level. *Id.* at 6–7. Judge McShane rejected the argument as "[n]either logical [n]or ration-

al." *Id.* at 7. I agree. I conclude that the trial court's reasoning in *Lerfald* accurately applies Minnesota law. *See Alsides v. Brown Inst., Ltd.,* 592 N.W.2d 468, 474 (Minn.1999) ("To sustain a claim for consumer fraud, a plaintiff must demonstrate that the defendant made a false promise or misrepresentation with the intent that others rely thereon."). The plaintiffs here fail, as did the plaintiffs in *Lerfald,* to allege any fraud or deception by the defendants. Therefore the motion to dismiss the Minnesota consumer protection claims is GRANTED.

### Missouri Consumer Protection Claim

▇ The Missouri Merchandising Practices Act ("MMPA") provides:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... in or from the state of Missouri, is declared to be an unlawful practice.

---

statute, Minn.Stat. §§ 325D.49.66; and the Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.68–70. The plaintiffs have brought a separate claim for relief for a violation of the Minnesota antitrust statute, Second Am. Compl. ¶ 99. The Minnesota unfair discrimination and competition statute and the Unlawful Trade Practices Act do not apply to the plaintiffs' allegations. *See* Minn.Stat. §§ 325D.01–.07 (forbidding price discrimination between different areas of the state, selling below cost, or considering bankrupt sales in fixing costs); Minn.Stat. §§ 325D.09–16 (prohibiting misrepresentation of the nature of a business or its merchandise and the sale of merchandise other than that handled in the regular course of business). I will thus address the Uniform Deceptive Trade Practices Act, Minn.Stat. §§ 325D.43–.48, and the Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.68–.70, the Minnesota consumer protection statutes that appear relevant to the plaintiffs' allegations.

**46.** The plaintiffs cite *Robinson v. EMI Music Distribution, Inc.,* CIV. A. No. L–10462, 1996 WL 495551 (Tenn.Cir.Ct. July 8, 1996), and *State v. Philip Morris Inc.,* 551 N.W.2d 490 (Minn.1996), to support their Minnesota consumer protection claims. The court in *Robinson* certified a class under statutes including Minnesota's Uniform Deceptive Trade Practices Act, Minn. Laws § 325D.44. 1996 WL 495551, at *2. *Robinson* did not address the issue whether a conspiracy or omission such as the plaintiffs allege in this case would constitute a deceptive practice under Minnesota consumer protection law. *See id. Philip Morris* is inapposite, because the plaintiffs' claims there that the defendants "illegally conspired to suppress research on the deleterious effects of smoking and to manipulate nicotine levels in cigarettes in order to induce nicotine addiction in smokers" did involve allegations of fraudulent or deceptive conduct. *See* 551 N.W.2d at 492.

Mo.Rev.Stat. § 407.020(1). Because I have concluded that the plaintiffs do not sufficiently allege deception, I turn to whether the alleged conspiracy to keep Canadian vehicles out of the United States is an "unfair practice" under the MMPA and, if so, whether these plaintiffs can recover damages. The MMPA does not define "unfair practice," but Missouri's attorney general, in a regulation authorized by the MMPA, has defined "unfair practice" as

> any practice which ... [o]ffends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive

decisions; or ... [i]s unethical, oppressive, or unscrupulous; and ... [p]resents a risk of, or causes, substantial injury to consumers.

Mo.Code Regs. Ann. tit. 15, § 60-8.020(1) (authorized by Mo.Rev.Stat. § 407.145).[47] The regulation also states that "[p]roof of deception, fraud, or misrepresentation is not required to prove unfair practices as used in section 407.020.1." [48] Mo.Code Regs. Ann. tit. 15, § 60-8.020(2). I conclude that the alleged conspiracy could qualify as an "unfair practice" in violation of the MMPA under the Missouri regulation.[49]

But in *Duvall v. Silvers, Asher, Sher & McLaren, M.D.'s, [sic] Neurology, P.C.,*

---

**47.** Section 407.145 authorizes the attorney general "to promulgate ... all rules necessary to the administration and enforcement of the provisions of this chapter." Mo.Rev.Stat. § 407.145.

**48.** The defendants contend that a plaintiff must allege fraud or deception to recover under the MMPA, citing *Willard v. Bic Corp.,* 788 F.Supp. 1059, 1071 (W.D.Mo.1991), and *Kiechle v. Drago,* 694 S.W.2d 292, 293–94 (Mo.Ct.App.1985) (both cited in Defs.' Mot. App. I.A. at 4). *Willard* involved an allegation that the defendant "concealed, suppressed, or omitted material facts regarding the dangerous and/or defective character of its lighters ...." 788 F.Supp. at 1070. The court noted that a common fact pattern of cases brought under the MMPA involves deceptive representations or omissions but did not address whether fraud or deception is required under the "unfair practices" provision of the MMPA. *See id.* at 1071–71. The plaintiff in *Kiechle* sued the defendant for fraud and for damages under the MMPA, and the court held that the evidence showed breach of contract but not, as the plaintiff contended, any false promise or deception. 694 S.W.2d at 293–94. *Kiechle* does not require a plaintiff to allege fraudulent or deceptive activity to state an MMPA claim. The court also stated that it is up to the court deciding an MMPA claim "in each particular instance to declare whether fair dealing has been violated." *Id.* at 293.

**49.** In *Ports Petroleum Co. v. Nixon,* the Supreme Court of Missouri limited the reach of the attorney general's broad definition of "unfair practice." 37 S.W.3d 237, 241 (Mo.2001) (en banc). The court held that a sale of motor fuel below cost, a violation of the Missouri Motor Fuel Marketing Act ("MFMA"), Mo.Rev.Stat. §§ 416.600–.640, was not an unfair practice under the MMPA. *Id.* The court distinguished the purpose of the MMPA, to protect consumers "who are the actual buyers in a sale," from the MFMA's purpose of protecting competition. It concluded that the MMPA did not apply because, although the sale of motor fuel below cost ultimately harmed competition, the buyer actually benefited from the lower price at the point of sale. *Id.* This case is distinguishable from *Ports Petroleum* because the alleged conspiracy *did* harm the plaintiffs, actual buyers, at the point of sale by maintaining high prices for motor vehicles. The alleged conspiracy could thus constitute an unfair practice in violation of the MMPA because it not only purportedly hindered competition but also immediately harmed the actual buyer. *Contra* Robert H. Dierker & Richard J. Mehan, 34 *Missouri Practice Series: Personal Injury and Torts Handbook,* § 29.2(2)(d) (2004) ("*Ports Petroleum* seems to stand for the proposition that an unfair practice under the Merchandising Practices Act must actually mislead a consumer to his or her detriment, to be actionable.").

the Missouri Court of Appeals held that individuals who claim only indirect harm from an antitrust violation do not have standing to bring a claim under Missouri's Antitrust Law. 998 S.W.2d 821, 825 (Mo. App.1999). Although the antitrust statute, Mo.Rev.Stat. §§ 416.011–.161, does not address the issue precisely, the court relied upon a federal harmonization provision in the Missouri antitrust statute, Mo.Rev. Stat. § 416.141,[50] and found the plaintiff's claim indistinguishable from the claims under the Clayton Act in *Illinois Brick.* *See Duvall,* 998 S.W.2d at 824–25. Following *Illinois Brick* and other federal guidance, the court concluded that direct purchasers, rather than indirect purchasers, are the only proper parties to assert an antitrust claim. *See id.* at 825–27; *see also Ireland v. Microsoft Corp.,* No. 00CV–201515, 2001 WL 1868946, at *1 (Mo.Cir. Jan. 24, 2001) (holding that, based on *Illinois Brick,* indirect purchasers cannot bring suit under Missouri's antitrust and consumer protection statutes). Indirect purchasers thus lack standing to sue under Missouri's Antitrust Law. *See Duvall,* 998 S.W.2d at 827. With no indication that the Supreme Court of Missouri would decide otherwise, I follow the Missouri Court of Appeals' decision in *Duvall.*

The plaintiffs cannot avoid this state law antitrust prohibition on indirect purchaser suits by making the same claim under Missouri's consumer protection statute. The plaintiffs' indirect purchaser status bars them from recovering for the alleged

conspiracy under the MMPA. The motion to dismiss the Missouri consumer protection claim is therefore **GRANTED.**

### *Montana Consumer Protection Claim*

■ In language very similar to section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), Montana's consumer protection statute prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont.Code Ann. § 30–14–103; *see Plath v. Schonrock,* 314 Mont. 101, 64 P.3d 984, 989 (2003) (noting that the Montana statute closely resembles the FTC Act); Pridgen, *supra,* § 3:5. The Montana statute directs courts to give "due consideration and weight" to FTC and federal court interpretations of section 5(a)(1) of the FTC Act. Mont.Code Ann. § 30–14–104(1); *see also Britton v. Farmers Ins. Group,* 221 Mont. 67, 721 P.2d 303, 323 (1986) (stating that, because of section 30–14–104 of the Montana statute, "[n]o interpretation of the [Montana consumer protection statute] can be inconsistent with the rules, regulations, and decisions of the Federal Trade Commission Act"). Without Montana caselaw to the contrary, I conclude that conduct violating the FTC Act would violate Montana's consumer protection statute as well.[51]

■ The plaintiffs contend that the conspiracy alleged here is a Sherman Act violation, a "group boycott," that also violates the FTC Act. Second Am. Compl. ¶ 3; Pls.' Oral Argument Ex.; *see Superior*

---

**50.** "Sections 416.011 to 416.161 shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." Mo.Rev.Stat. § 416.141.

**51.** Contrary to the defendants' contention, Defs.' Mot.App. I.A. at 5, I do not read *Matthews v. Berryman,* 196 Mont. 49, 637 P.2d 822 (1981), as requiring allegations of fraud, duress or undue influence for the Montana consumer protection statute to apply. Unlike

this case, the plaintiffs in *Matthews* did not allege unfair methods of competition, but rather alleged and failed to prove fraud, duress, coercion and undue influence. *See Matthews,* 637 P.2d at 823–25. The claims in *Matthews* thus only involved fraud or deception, and the court did not need to address the reach of the statutory prohibitions on unfair practices and unfair methods of competition. *See id.* at 826.

*Court Trial Lawyers Ass'n,* 493 U.S. at 422, 110 S.Ct. 768 (holding that a group boycott is a restraint of trade and a violation of the FTC Act); *Cement Inst.,* 333 U.S. at 694, 68 S.Ct. 793 (stating that Sherman Act violations may also be prohibited by the FTC Act).[52] This alleged antitrust and FTC Act violation could therefore constitute a violation of Montana's consumer protection act.[53]

As explained for the Maine consumer protection statute, the application of the Montana consumer protection statute is not limited to those who engage directly in consumer transactions. CADA and NADA are thus not automatically exempt.

The motion to dismiss the Montana consumer protection claim is therefore **DENIED.**

### New Hampshire Consumer Protection Claim

 New Hampshire prohibits the "use [of] any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce *within this state."* N.H.Rev.Stat. Ann. § 358-A:2 (emphasis added). New Hampshire state courts have not addressed whether it is just the trade or commerce or the unlawful act itself that must occur within the state. New Hampshire federal court decisions have interpreted the statute to require that the offending conduct occur within New Hampshire. *Pacamor Bearings, Inc. v. Minebea Co.,* 918 F.Supp. 491, 504 (D.N.H.1996); *see also Mueller Co. v. United States Pipe & Foundry Co.,* No. Civ. 03–170–JD, 2003 WL 22272135, at *6 (D.N.H. Oct. 2, 2003); *Environamics Corp. v. Ferguson Enters., Inc.,* No. Civ. 00–579–JD, 2001 WL 1134727, at *4

(D.N.H. Sept. 24, 2001). I conclude that the plaintiffs have sufficiently alleged intrastate activity whether the trade or commerce or the offending conduct must occur in New Hampshire.

New Hampshire sales are trade or commerce within the state. Regarding offending conduct in New Hampshire, the plaintiffs allege that the conspiracy involved concerted efforts to affect the prices of motor vehicles sold throughout the United States (thus including New Hampshire). *See* Second Am. Compl. ¶ 1 (alleging conspiracy to exclude Canadian motor vehicles from the United States market and resulting maintenance of high prices of motor vehicles in the United States). It is reasonable to read the Second Amended Complaint as alleging that the defendant automobile manufacturers and dealer associations conspired with New Hampshire dealers to ban Canadian motor vehicles from the market, resulting in higher motor vehicle prices in New Hampshire. *See* Second Am. Compl. ¶ 39 (naming the dealer associations and United States dealers as co-conspirators). The involvement of New Hampshire dealers in the conspiracy constitutes "offending conduct" in New Hampshire.

As with Maine and Montana, the New Hampshire consumer protection statute does not apply only to those who have directly engaged in trade or commerce with consumers. CADA and NADA are thus not exempt from the reach of the New Hampshire consumer protection statute.

The motion to dismiss the New Hampshire consumer protection claim is therefore **DENIED.**

---

**52.** The defendants concede that "the FTC Act explicitly applies to antitrust violations." Defs.' Reply at 3.

**53.** Montana courts, unlike courts in Maryland, discussed *supra,* and Oklahoma, discussed *infra,* have not held that an antitrust violation cannot also violate the consumer protection statute.

### *New Jersey Consumer Protection Claim*

The New Jersey Consumer Fraud Act ("NJCFA") forbids

[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, [sic] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise ... whether or not any person has in fact been misled, deceived, or damaged thereby.

N.J. Stat. Ann. § 56:8–2. The NJCFA is not directly modeled on the FTC Act and does not contain a harmonization clause. *See* N.J. Stat. Ann. §§ 56:8–1 to –152; Pridgen, *supra*, § 3:5.

 I have ruled that the Second Amended Complaint, as "amended" by oral argument, does not allege fraud or deception. Therefore, I turn to whether the alleged conspiracy is an unlawful "unconscionable commercial practice." The Supreme Court of New Jersey has held that, under the NJCFA, "[t]he standard of conduct that the term 'unconscionable' implies is lack of 'good faith, honesty in fact and observance of fair dealing.'" *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 647 A.2d 454, 462 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 279 A.2d 640, 651, 652 (1971)); *see also Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 541 A.2d 1063, 1067

(1988) (stating the same definition of "unconscionable"). This standard seems to encompass the conspiracy alleged by the plaintiffs, except for the fact that the Supreme Court of New Jersey has also repeatedly stated that "[t]he capacity to mislead is the prime ingredient of deception or an unconscionable consumer practice" under the NJCFA. *Chattin v. Cape May Greene, Inc.*, 124 N.J. 520, 591 A.2d 943, 945 (1991) (quoting *Fenwick v. Kay Am. Jeep, Inc.*, 72 N.J. 372, 371 A.2d 13, 16 (1977)); *see also Cox*, 647 A.2d at 462. The Supreme Court of New Jersey has not clarified whether, by "prime ingredient," it means that the capacity to mislead is merely a significant and conventional element of an NJCFA claim or if it is, in fact, indispensable to such a claim.[54]

In *Cox v. Sears Roebuck & Co.*, the Supreme Court of New Jersey held that noncompliance with New Jersey's Home Improvement Practices regulations, N.J. Admin. Code § 13:45A–16.2 (promulgated by the Attorney General under section 56:8–4 of the NJCFA), constituted a violation of the NJCFA. *Cox*, 647 A.2d at 461, 463. In holding that the failure of a home-repair contractor to secure the necessary permits (before beginning improvements) violated the NJCFA, the court seems to have recognized that the NJCFA covers more than conduct that has the capacity to mislead. *See id.* at 463. But I do not need to decide whether the NJCFA requires the capacity to mislead, because the plaintiffs' indirect purchaser status independently bars their NJCFA claims.[55]

---

**54.** The Supreme Court of New Jersey has stated that the NJCFA's "remedial purpose [is], namely, to root out consumer fraud." *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 696 A.2d 546, 551 (N.J.1997). I do not read this statement as limiting the applicability of the NJCFA solely to cases involving consumer fraud. This conclusion is bolstered by the Supreme Court of New Jer-

sey's statement that "the [NJCFA] should be construed liberally in favor of consumers." *See Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 647 A.2d 454, 461 (1994).

**55.** Although I do not reach the issue, I note that the Law Division of the New Jersey Superior Court, in *Kieffer v. Mylan Laboratories*, No. BER–L–365–99–EM, 1999–2 Trade Cas.

New Jersey's Antitrust Act, N.J. Stat. Ann. §§ 56:9-1 to -19, contains a harmonization clause which provides: "This act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it." N.J. Stat. Ann. § 56:9-18. The Antitrust Act does not authorize indirect purchaser suits. *See* N.J. Stat. Ann. §§ 56:9-1 to -19. The New Jersey Legislature, in fact, rejected an amendment to the Antitrust Act that would have expressly allowed for indirect purchaser suits. *Compare* N.J. Assemb. Bill No. 4629, 204th Leg., 2d Reg. Sess. (1991) (proposing to amend section 12(a) of the Antitrust Act to allow recovery for "[a]ny person who shall be injured *directly or indirectly* in his business or property by reason of a violation of the, [sic] provisions of this act") *with* N.J. Stat. Ann. § 56:9-12(a) (allowing recovery for "[a]ny person who shall be injured in his business or property by reason of a violation of the provisions of this act"). I conclude that New Jersey's Antitrust Act permits only direct purchasers to recover, and that allowing recovery for antitrust

violations under the NJCFA would violate the Antitrust Act's restriction on indirect purchaser suits.[56] The motion to dismiss the New Jersey consumer protection claim is therefore **GRANTED**.

### New Mexico Consumer Protection Claim

The New Mexico Unfair Practices Act ("NMUPA") prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M. Stat. Ann. § 57-12-3. "Unfair or deceptive trade practice" is separately defined in section 57-12-2(D), and includes "an act specifically declared unlawful pursuant to the [NMUPA]" as well as any false or misleading statement that does or has the capacity to deceive or mislead. Because I have ruled that the plaintiffs have failed to adequately allege deception or a capacity to deceive, I turn to the unconscionable trade practice standard, also separately defined.

An unconscionable trade practice is "an act or practice ... which to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair

---

(CCH) ¶ 72,673 (N.J.Super. Ct. Law Sept. 9, 1999), stated that allegations must involve "inherently misleading or fraudulent conduct" to state a claim under the NJCFA, and thus held that the NJCFA did not encompass allegations of anticompetitive conduct. *See id.*

56. Rule 1:36-3 of the New Jersey Rules of Court prevents me from relying on the unpublished New Jersey opinions cited by both sides. *See* N.J. Rules of Court 1:36-3 (stating that "[n]o unpublished opinion shall constitute precedent or be binding upon any court" and that "no unpublished opinion shall be cited by any court"). For what it is worth, my conclusion is consistent with the reasoning of the Law Division of the New Jersey Superior Court in *Island Mortgages of New Jersey v. 3M*, 373 N.J.Super. 172, 179-80, 860 A.2d 1013, 1017-18 (2004); *Wilson v. General*

*Motors Corp.*, No. L-1287-03, at 2 (Defs.' Mot. Ex. F) (N.J. Super Ct. Law Div. Oct. 3, 2003), a parallel New Jersey case involving the same facts alleged by the plaintiffs in this lawsuit; and *Kieffer v. Mylan Laboratories, Inc.*, 1992 Trade Cas. (CCH) ¶ 72,673. In these cases, cited by the defendants, New Jersey courts held that indirect purchaser plaintiffs could not undermine the Antitrust Act's ban on indirect purchaser suits by bringing their claims for alleged antitrust violations under the NJCFA. *See id.* The plaintiffs cite one case to the contrary, *Cement Masons Local Union No. 699 Health & Welfare Fund v. Mylan Laboratories, Inc.*, Docket No. MER-L-000431-99 (N.J.Super. Ct. Law Div. April 18, 2000) (Pls.' Opp'n Palmer Decl. Ex. E), which allowed indirect purchasers to recover under the NJCFA for their claims of alleged antitrust violations.

degree; or (2) results in a gross disparity between the value received by a person and the price paid." [57] N.M.Rev.Stat. § 57–12–2(E). The claim that the conspiracy maintained prices for motor vehicles in the United States that were up to thirty percent more than prices for the same make and model vehicles in Canada is adequate to allege a gross disparity between the value received and the price paid for the motor vehicles purchased by the plaintiffs. *See* Second Am. Compl. ¶ 1. The plaintiffs therefore sufficiently allege an unconscionable business practice under the NMUPA.[58]

■ The defendants contend that the plaintiffs' indirect purchaser status prevents them from pursuing an NMUPA claim. Nothing in the NMUPA precludes indirect purchaser suits. *See* N.M. Stat. Ann. §§ 57–12–1 to –24. I observe that New Mexico's antitrust statute expressly provides a cause of action for "any person threatened with injury or injured in his business or property, *directly or indirectly*." N.M. Stat. Ann. § 57–1–3(A) (emphasis added). There are thus no limitations on indirect purchasers' standing under the antitrust statute that would counsel against indirect purchaser suits for antitrust violations under the NMUPA.[59] The plaintiffs, as indirect purchasers, may thus pursue their NMUPA claim for the alleged conspiracy.

As for CADA and NADA, New Mexico's consumer protection statute does not limit its application to those who have directly engaged in trade or commerce with consumers. CADA and NADA are therefore not exempt from its coverage.

The motion to dismiss the New Mexico consumer protection claim is therefore DE-NIED.

### New York Consumer Protection Claim

New York's General Business Law § 349 ("section 349") provides: "Deceptive acts or practices in the conduct of any business, trade or commerce in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen.

---

**57.** For a definition of unconscionable, the defendants cite *Guthmann v. La Vida Llena*, 103 N.M. 506, 709 P.2d 675, 680 (1985). Defs.' Mot.App. I.B at 12. *Guthmann*, however, did not involve an NMUPA claim. (It addressed procedural and substantive unconscionability in contract terms. 709 P.2d at 679–80.) I rely on the NMUPA's definition of "unconscionable." N.M. Stat. Ann. § 57–2–12E.

**58.** The defendants cite *Thompson v. Youart*, 109 N.M. 572, 787 P.2d 1255, 1259 (1990), to support their contention that a plaintiff must allege a *deceptive misrepresentation* to state a claim under the NMUPA. Defs.' Mot.App. I.B., at 12. *Thompson*, however, describes (as the defendants themselves note in their explanatory parenthetical for the case) the standard for a claim of *unfair or deceptive* practices and not *unconscionable* trade practices. 787 P.2d at 1259. The standard announced in *Thompson* and cited by the defendants is actually a restatement of the statutory definition of "unfair or deceptive trade practice" in N.M. Stat. Ann. § 57–12–2(D).

**59.** The defendants claim that "it is well established that indirect purchasers in New Mexico do not have standing to assert claims under any New Mexico statute unless specifically authorized by the statute." Defs.' Mot. at 11 n. 10. The cases the defendants cite to support this contention, *Marchman v. NCNB Texas National Bank*, 120 N.M. 74, 898 P.2d 709, 715–19 (1995), and *Delta Automatic Systems, Inc. v. Bingham*, 126 N.M. 717, 974 P.2d 1174, 1177 (1999) (both cited in Defs.' Mot. App. II, at 19), hold only that corporate shareholders and other indirectly injured parties may not assert a cause of action on behalf of the directly injured corporation unless the shareholder or other indirectly injured party has suffered a separate injury or is owed a special duty by the wrongdoer. I do not read these shareholder cases as limiting the right of indirect purchasers to bring an NMUPA claim in other contexts.

Bus. Law § 349(a). To make out a prima facie case under section 349, an individual must show "that [the] defendant is engaging in an act or practice that is deceptive or misleading in a material way and that [the] plaintiff has been injured by reason thereof." *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 746 N.Y.S.2d 858, 774 N.E.2d 1190, 1195 (2002) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741, 744 (1995)). An act or practice is deceptive if it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego*, 623 N.Y.S.2d 529, 647 N.E.2d at 745.

As I previously explained, even if the plaintiffs "amend" their Second Amended Complaint with their claims at oral argument, they do not allege any practice that could be considered deceptive or likely to mislead a reasonable consumer under section 349. Their "omissions" argument fails because the failure to reveal the conspiracy did not affect the price of the vehicles or the consumer's decision to purchase the vehicle. At oral argument the plaintiffs contended that the alleged conspiracy, which the plaintiffs characterize as a "group boycott," Second Am. Compl. ¶ 3, violates section 349. Although section 349 is modeled on the FTC Act, *Oswego*, 623 N.Y.S.2d 529, 647 N.E.2d at 745, the plain language of section 349 does not include the FTC Act's prohibition on

unfair methods of competition and unfair acts and practices. *Compare* N.Y. Gen. Bus. Law § 349(a) *with* 15 U.S.C. § 45(a)(1). An antitrust violation may violate section 349, but only if it is deceptive. *See Oswego*, 623 N.Y.S.2d 529, 647 N.E.2d at 744 (stating that a prima facie case under section 349 requires a showing of deception); *see also New York v. Feldman*, 210 F.Supp.2d 294, 302 (S.D.N.Y. 2002) ("The antitrust violations alleged in the Complaint constitute the kind of deceptive acts and practices contemplated by section 349.").[60] The plaintiffs have failed to allege that this conspiracy involved deception and therefore cannot state a claim under section 349. *See Paltre v. Gen. Motors Corp.*, Index No. 005014/2003, at 14 (N.Y.Sup.Ct. Apr. 21, 2004) (Defs.' Mot. Ex. E). (dismissing plaintiffs' section 349 claim in parallel case). The motion to dismiss the New York consumer protection claims as to all defendants is GRANTED.

### North Dakota Consumer Protection Claim

North Dakota's consumer protection statute declares unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise," N.D. Cent.Code § 51-15-02. The statute does not include the

**60.** The plaintiffs cite a number of cases where courts have held that an alleged antitrust violation is also a violation of section 349. Pls.' Opp'n at 7 & n. 14; Pls.' Oral Argument Ex. In all these cases, the courts determined that the antitrust violations involved, or the plaintiffs separately alleged, deceptive acts or practices prohibited by section 349. *See Excellus Health Plan, Inc. v. Tran*, 287 F.Supp.2d 167, 179–180 (W.D.N.Y.2003) (noting that the allegations of a group boycott and other antitrust violations included claims of misleading state-ments made with an intent to deceive); *New York v. Feldman*, 210 F.Supp.2d 294, 302 (S.D.N.Y.2002) (finding that allegations that defendants colluded to rig auction bids constituted a deceptive practice under section 349); *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 778 N.Y.S.2d 147, 148 (2004) (holding that plaintiffs had sufficiently alleged "purposeful, deceptive monopolistic business practices" to survive a motion to dismiss their section 349 claim).

FTC Act's prohibition on unfair acts or unfair competition but instead is limited to a proscription on deception, fraud and misrepresentation. *Compare* N.D. Cent.Code § 51–15–02 *with* 15 U.S.C. § 45(a)(1). The North Dakota consumer protection statute does not contain a harmonization provision directing courts to interpret it in harmony with interpretations of the FTC Act. *See* N.D. Cent.Code §§ 51–15–01 to –11.

North Dakota courts have had few occasions to interpret the North Dakota consumer protection statute. In *State ex rel. Spaeth v. Eddy Furniture Co.*, the Supreme Court of North Dakota affirmed the dismissal of a North Dakota consumer protection claim and noted in dictum that it was upholding "the trial court's determination that the conduct in this case was not fraudulent or deceitful, and therefore not violative of Chapter[ ] ... 51–15." 386 N.W.2d 901, 905 n. 5 (N.D.1986). I conclude that a plaintiff must allege fraudulent or deceptive conduct to maintain a North Dakota consumer protection claim, based on the plain language of the statute and supported by Supreme Court of North Dakota's statement in dictum in *Eddy*.[61]

The plaintiffs have failed to allege fraud or deception. The defendants' motion to dismiss the North Dakota consumer protection claim is therefore GRANTED.

### *Ohio Consumer Protection Claim*

The Ohio Consumer Sales Practices Act ("OCSPA") forbids a supplier from engaging in an unfair or deceptive act or practice, Ohio Rev.Code Ann. § 1345.02(A), or an unconscionable act or practice, Ohio Rev.Code Ann. § 1345.03(A), in connection with a consumer transaction. The plaintiffs do not allege an unfair or deceptive act, defined as an act that "has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts."[62] *Richards v. Beechmont Volvo*, 127 Ohio App.3d 188, 711 N.E.2d 1088, 1090 (1998) (quoting *Funk v. Montgomery AMC/Jeep/Renault*, 66 Ohio App.3d 815, 586 N.E.2d 1113, 1119 (1990)).

The plaintiffs have also failed to allege an unconscionable practice in violation of section 1345.03. The OCSPA lists a number of circumstances for courts to consider when determining whether an act is unconscionable.[63] Ohio Rev.Code Ann.

---

**61.** The plaintiffs cite the Tennessee Circuit Court case of *Robinson v. EMI Music Distribution, Inc.*, 1996 WL 495551, to support their consumer protection claims in North Dakota and other states. The court in *Robinson* addressed a motion for class certification, based on a claim of price-fixing, under a variety of state statutes, including the North Dakota consumer protection statute. *Id.* The court in *Robinson* certified the class but did not reach the merits of the plaintiffs' claims, and thus did not consider whether the North Dakota statute requires allegations of fraud or deception.

**62.** Claiming that the OCSPA is one of a number of state consumer protection statutes "substantially modeled" on the FTC Act, the plaintiffs urge me to follow the FTC's definition of "unfair acts" in interpreting the OCSPA. Pls.' Opp'n at 7. Section 1345.02(A) of the OCSPA is similar to the FTC Act in that it

forbids unfair or deceptive acts or practices, but the OCSPA notably does not contain the FTC Act's prohibition on "unfair methods of competition." *Compare* Ohio Rev.Code Ann. § 1345.02(A) *with* 15 U.S.C. § 45(a)(1). The OCSPA does contain a harmonization provision, which provides: "In construing division (A) of this section, the court shall give due consideration and great weight to federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection 45(a)(1) of the [FTC Act] ...." Ohio Rev.Code Ann. § 1345.02(C). Nevertheless, I follow the Ohio courts' definition of "unfair or deceptive act or practice" rather than the FTC Act's definition of "unfair acts."

**63.** Section 1345.03(B) of the OCSPA provides:

§ 1345.03(B). The plaintiffs' allegations do not fit any of the listed circumstances. *See id.* The circumstance most relevant to this case is "[w]hether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers." Ohio Rev.Code Ann. § 1345.03(B)(2). Although the plaintiffs allege that the prices of motor vehicles in the United States exceeded prices for the same vehicles in Canada, they also claim that the same cars were not "readily obtainable" because of the conspiracy. *See* Second Am. Compl. ¶ 1 (alleging inflated motor vehicle prices in the United States and the effect of the conspiracy of "prevent[ing] . . . consumers from obtaining lower-priced vehicles in Canada"). Additionally, there is no allegation that Canadian consumers are to be considered "like consumers" under section 1345.03(B)(2), or that the OCSPA contemplates international price comparisons.

The defendants' motion to dismiss the Ohio consumer protection claims is GRANTED on the basis that the plaintiffs failed to allege unfair, deceptive or unconscionable conduct.

### Oklahoma Consumer Protection Claim

The Oklahoma Consumer Protection Act ("OCPA") prohibits both "deceptive" and "unfair" trade practices. Okla. Stat. tit. 15, § 753(20). The plaintiffs have not sufficiently alleged a "deceptive trade practice," defined in the OCPA as an actually or potentially misleading or deceptive practice. *See* Okla. Stat. tit. 15, § 752(13). The alleged conspiracy to keep Canadian cars out of the United States, Second Am. Compl. ¶¶ 1–3, does constitute an "unfair trade practice," defined as "any practice which offends established public policy or [any] practice [that] is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *See* Okla. Stat. tit. 15, § 752(14). The plaintiffs' indirect purchaser status, however, prevents them from maintaining their OCPA claim.

In *Major v. Microsoft Corp.*, the Court of Civil Appeals of Oklahoma affirmed the decision of the trial court that the OCPA "should not extend to anticompetitive con-

In determining whether an act or practice is unconscionable, the following circumstances shall be taken into consideration:
(1) Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect his interests because of his physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement;
(2) Whether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers;
(3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;
(4) Whether the supplier knew at the time the consumer transaction was entered into that there was no reasonable probability of payment in full of the obligation by the consumer;
(5) Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;
(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to his detriment;
(7) Whether the supplier has without justification, refused to make a refund in cash or by check for a returned item that was purchased with cash or by check, unless the supplier had conspicuously posted in the establishment at the time of the sale a sign stating the supplier's refund policy.
Ohio Rev.Code Ann. § 1345.03(B).

duct" and that the direct purchaser requirement under Oklahoma's antitrust laws prevents indirect purchasers from recovering for an antitrust violation under the OCPA. 60 P.3d 511, 513, 517 (2002). The trial court opinion in *Major* explained that plaintiffs "should not be permitted under the law to avoid the United States Supreme Court's policy choices expressed in *Illinois Brick* by recasting [their] claims of anticompetitive conduct as a Consumer Protection Act claim." *Id.* at 517. *Illinois Brick* controls Oklahoma antitrust recovery because Oklahoma's Antitrust Reform Act provides that "[t]he provisions of this act shall be interpreted in a manner consistent with Federal Antitrust Law 15 U.S.C., Section 1 *et seq.,* and the case law applicable thereto," Okla. Stat. tit. 79, § 212. *See Major,* 60 P.3d at 514.

I find *Major* to be a reasonable interpretation of Oklahoma law and conclude, therefore, that the plaintiffs, as indirect purchasers, cannot assert a consumer protection claim for damages based upon anticompetitive conduct.[64] Although indirect purchasers may recover for fraud, *see Brannon v. Munn,* 68 P.3d 224, 227 (2002) (allowing a plaintiff, who was in the same position as an indirect purchaser, to sue based on the conclusion that privity is not required to bring a fraud-based OCPA claim), I have already explained why the Second Amended Complaint, even as "amended" at oral argument, does not state a claim for fraud or deception.

The motion to dismiss the plaintiffs' Oklahoma consumer protection claim is therefore GRANTED.

### Pennsylvania Consumer Protection Claim

■ The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by [sections 201–2(4)(i) to (xxi) ] and regulations promulgated under section 3.1 of this act." Pa. Stat. Ann. tit. 73, § 201–3. Although the statute is to be liberally construed, *see Commonwealth v. Monumental Props., Inc.,* 459 Pa. 450, 329 A.2d 812, 816 (1974), and although the "unfair methods of competition" language might be thought to prohibit anticompetitive behavior, a federal appellate court familiar with Pennsylvania law has stated that the PUTPCPL "bans only the enumerated activities," *Smith v. Commercial Banking Corp. (In re Smith),* 866 F.2d 576, 583 (3d Cir.1989). The only provision in section 201–2(4) of the PUTPCPL that potentially relates to this case prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," Pa. Stat. Ann. tit. 73, § 201–2(4)(xxi). (The plaintiffs have not pointed to any relevant regulations promulgated under the PUTPCPL.) The plain language of this catchall subsection requires fraud or deception. *See In re K–Dur Antitrust Litig.,* 338 F.Supp.2d 517, 548 (D.N.J.2004); *Commonwealth v. Percudani,* 825 A.2d 743, 746–47 (2003). The Second Amended Complaint even as "amended" at oral argument does not state a claim

**64.** *FTC v. Mylan Laboratories, Inc.,* 99 F.Supp.2d 1 (D.D.C.1999) (cited in Pls.' Opp'n at 10), does not help the plaintiffs. In that case, Judge Hogan reinstated the Oklahoma Attorney General's claim for restitution on behalf of indirect purchasers under section 756.1(C)(2) of the OCPA. *Id.* at 8. Private plaintiffs like those in this lawsuit must seek recovery under section 761.1 of the OCPA. I find the reasoning of *Major,* 60 P.3d 511, discussed above, persuasive in anticipating what the Supreme Court of Oklahoma will do when called upon to rule on whether indirect purchasers may sue for antitrust violations under the OCPA.

for fraud or deception.[65] Therefore, the motion to dismiss the Pennsylvania consumer protection claim is GRANTED.

### Rhode Island Consumer Protection Claim

 The Rhode Island Deceptive Trade Practices Act ("RIDTPA") prohibits a list of behaviors designated as "[u]nfair methods of competition [or] unfair or deceptive acts or practices," R.I. Gen. Laws §§ 6–13.1–1(5) to –2. The RIDTPA also provides that it shall not "apply to actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States." R.I. Gen. Laws § 6–13.1–4. The Supreme Court of Rhode Island has ruled that this provision exempts from the RIDTPA's coverage "all those activities and businesses which are subject to monitoring by state or federal regulatory bodies or officers." *State v. Piedmont Funding Corp.*, 119 R.I. 695, 382 A.2d 819, 822 (1978). Motor vehicle manufacturers, distributors and dealers are regulated by the State of Rhode Island pursuant to a separate statute, "Regulation of Business Practices among Motor Vehicle Manufacturers, Distributors, and Dealers." R.I. Gen. Laws §§ 31–5.1–1 to –21. That statute forbids "[u]nfair methods of competition, and unfair or deceptive acts or practices, as defined in [the motor vehicle regulation] chapter," R.I. Gen. Laws § 31–5.1–3(a), and enumerates a long list of prohibited practices, R.I. Gen. Laws. § 31–5.1–4.[66] The Rhode Island Department of Administration is charged with enforcing that statute. R.I Gen. Laws § 31–5.1–12.

Because the conduct at issue in this lawsuit appears to be subject to monitoring by the Rhode Island Department of Administration, the RIDTPA's exemption provision may apply. "When the party claiming exemption from the [RIDTPA] shows that the general activity in question is regulated by [state or federal regulatory bodies or officers], the opposing party . . . then has the burden of showing that the specific acts at issue are not covered by the exemption." *Piedmont*, 382 A.2d at 822. In response to the defendants' argument for exemption, the plaintiffs argue that the RIDTPA "specifically authorizes a private right of action." Pls.' Opp'n at 11 (emphasis omitted). The fact that the RIDTPA authorizes a private right of action for a violation of its provisions, however, does not mean that it authorizes a private right of action for a violation of the motor vehicle regulation statute.

In support of their contention that the RIDTPA claim is viable, the plaintiffs point to *Park v. Ford Motor Co.*, 844 A.2d 687 (R.I.2004) (cited in Pls.' Opp'n App. D),

---

**65.** *Pirozzi v. Penske Olds–Cadillac–GMC, Inc.*, 413 Pa.Super. 308, 605 A.2d 373 (1992) (cited in Pls.' Oral Argument Ex.), does not save the plaintiffs' Pennsylvania consumer protection claim. The allegations in *Pirozzi*, that the defendant automobile dealership failed to reveal that a vehicle had been damaged and repaired before sale, involved allegations of fraudulent conduct, unlike the allegations in this case. *See id.* at 377.

**66.** The motor vehicle regulation statute applies to "[a]ny person who engages directly in purposeful contacts within this state in connection with the offering or advertising for sale of, or has business dealings with respect to, a motor vehicle within the state." R.I. Gen. Laws § 31–5.1–2. The statute thus applies to all the defendants, including the dealer associations, because all the defendants allegedly conspired to keep Canadian motor vehicles out of the United States (presumably including Rhode Island) and maintain artificially high prices for motor vehicles sold throughout the United States (including motor vehicles within Rhode Island). Second Am. Compl. ¶¶ 1–2, 39.

and *Kennedy v. Acura & Am. Honda Motor Co.*, No. 01–4063, 2002 WL 31331373 (R.I.Super. Aug. 28, 2002) (cited in Pls.' Opp'n at 11; *id.* App. D). These cases do little to support the plaintiffs' position. *Park* held that Rhode Island General Laws section 6–13.1–5.2(a) (which provides that a private right of action for a violation of the RIDTPA shall be brought "in the superior court of the county in which the seller or lessor resides") trumps a more general amount-in-controversy requirement.[67] 844 A.2d at 694. Although the plaintiffs are correct in stating that *Park* involves a vehicle and the RIDTPA, the Supreme Court of Rhode Island made no comment whatsoever as to the viability of the claim beyond the initial jurisdictional determination. It did not address whether the RIDTPA or the statute specifically regulating motor vehicle manufacturers actually governed the dispute. *Kennedy*, an unpublished case from the Rhode Island Superior Court, actually found that the plaintiffs' claims were exempt from the RIDTPA because the claims "constitute[d] consumer product warranty claims which are governed by the Federal Trade Commission under the Magnuson–Moss Warranty—Federal Trade Commission Improvement Act." 2002 WL 31331373, at *3. (It is true, as the plaintiffs say, that the case at bar "does not involve a defective goods or warranty claim," Pls.' Opp'n App. D, but that hardly explains why the RIDTPA exemption should not apply.)

Because the defendants have persuasively argued that the general activity in question (automobile sales) is regulated by a state or federal regulatory body or officers, and because the plaintiffs have failed to carry their burden of showing that the specific acts in question are not covered by

the exemption, *see Piedmont*, 382 A.2d at 822, the motion to dismiss plaintiffs' claim under Rhode Island's Deceptive Trade Practices Act is GRANTED.

### South Dakota Consumer Protection Claim

■ South Dakota's statute on Deceptive Trade Practices and Consumer Protection, S.D. Codified Laws §§ 37–24–1 to –40, prohibits only those acts or practices specifically designated as unlawful in the statute. *See, e.g.,* S.D. Codified Laws § 37–24–6 (enumerating what constitutes a prohibited "deceptive act or practice"); *id.* § 37–24–31 (permitting a civil action for recovery of actual damages for "any person who claims to have been adversely affected by any act or a practice declared to be unlawful by § 37–24–6"). The only applicable provision declares it "a deceptive act or practice for any person to ... [k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise." S.D. Codified Laws § 37–24–6(1). *See also Northwestern Pub. Serv. v. Union Carbide Corp.*, 236 F.Supp.2d 966, 973–74 (D.S.D.2002) (stating that a claim under this provision "require[s] proof of an intentional misrepresentation or concealment of a fact on which plaintiff relied"); *Brookings Mun. Utils., Inc. v. Amoco Chem. Co.*, 103 F.Supp.2d 1169, 1178 (D.S.D.2000) (stating the same standard). I have already determined that the plaintiffs have not alleged fraud or deception.

The plaintiffs responded to the motion to dismiss the South Dakota consumer pro-

---

**67.** The relevant provision of Rhode Island General Laws section 8–2–14(a) gives the superior court "concurrent original jurisdiction with the district court in all other actions at law in which the amount in controversy exceeds the sum of five thousand dollars ($5,000) and does not exceed ten thousand dollars ($10,000)."

tection claim by citing *Robinson v. EMI Music Distribution, Inc.*, Civ. A. No. L–10462, 1996 WL 495551, at *2 (Tenn.Cir.Ct. July 8, 1996) (cited in Pls.' Oral Argument Ex.). That decision grants conditional class certification in a dispute involving retail CD purchases. *Id.* at *1. South Dakota statutes are merely listed as being at issue in the suit; no mention whatsoever is made as to their substance. *Id.* at *2. Given the plain language of the statute, the motion to dismiss the South Dakota consumer protection claim is GRANTED.

### Tennessee Consumer Protection Claim

The Tennessee Consumer Protection Act ("TCPA"), Tenn.Code Ann. §§ 47–18–101 to –125, declares unlawful "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn.Code Ann. § 47–18–104(a). The act or practice "need not be willful or knowingly made [for a plaintiff] to recover actual damages under the [TCPA]." *Smith v. Scott Lewis Chevrolet, Inc.*, 843 S.W.2d 9, 12 (Tenn.Ct.App.1992). A plaintiff "is not required to show reliance upon a misrepresentation by the defendant in order to maintain a cause of action." *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 469 (Tenn.Ct.App.2003). According to the Tennessee Court of Appeals, "[h]owever, there must be a deceptive act by the defendant before the defendant can be held liable under the TCPA." *Id.; see also McDonald's Corp. v. Shop at Home, Inc.*, 82 F.Supp.2d 801, 816–17 (M.D.Tenn.2000).

The plaintiffs state that the TCPA is "substantially modeled on the [FTC Act]" and suggest that I adopt the FTC Act's definition of "unfair acts." [68] Pls.' Opp'n at 7. The TCPA does direct courts to look to federal interpretations of the FTC Act for guidance when interpreting the TCPA.[69] Tenn.Code Ann. § 47–18–115. Nevertheless, I follow the narrower interpretation of the Tennessee courts and apply the Tennessee Court of Appeals' recent holding that deception is required for a TCPA claim. *Messer Griesheim Indus.*, 131 S.W.3d at 469.[70] I have already concluded that the acts of the defendants do not constitute fraudulent or deceptive conduct. Therefore, the motion to dismiss the plaintiffs' claim under the TCPA is GRANTED.

### Utah Consumer Protection Claim

 The Utah Consumer Sales Practices Act ("UCSPA") prohibits deceptive and unconscionable acts or practices "*by a supplier* in connection with a consumer

---

**68.** The TCPA is similar to the FTC Act in that it prohibits unfair or deceptive acts; however, the TCPA, unlike the FTC Act, does not prohibit unfair methods of competition. *Compare* Tenn.Code Ann. § 47–18–104(a) *with* 15 U.S.C. § 45(a)(1).

**69.** In determining whether a practice is "unfair" under the FTC Act, the Federal Trade Commission considers "(1) whether the practice . . . offends public policy as it has been established by statutes, the common law, or otherwise . . . (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). Given that the conduct at issue is an alleged antitrust violation, the

applicability of this definition is questionable because the Federal Trade Commission only considers these factors "in determining whether a practice that *is neither in violation of the antitrust laws* nor deceptive is nonetheless unfair." *Id.* (emphasis added).

**70.** Moreover, there is authority for the assertion that the TCPA does not apply to anticompetitive behavior. *See Sherwood v. Microsoft Corp.*, No. M2000–01850–COA–R9–CV, 2003 WL 21780975, at *31–*33 (Tenn.Ct.App. July 31, 2003) (concluding, based on the failure of the Tennessee General Assembly to include a prohibition on unfair competition in the TCPA, "that claims based upon anticompetitive conduct are not cognizable under the TCPA").

transaction." Utah Code Ann. §§ 13–11–4(1), –5(1) (emphasis added). The UCSPA defines "supplier" as "a seller, lessor, assignor, offeror, broker, or other person who regularly solicits, engages in, or enforces consumer transactions, whether or not he deals directly with the consumer." Utah Code Ann. § 13–11–3(6). The plaintiffs do not allege that the dealer association defendants, CADA and NADA, regularly solicit, engage in, or enforce consumer transactions. *See* Second Am. Compl. ¶¶ 36–37 (stating that CADA and NADA represent automobile dealers and present dealers' views to the government and the public). Because these defendant dealer associations are not "suppliers" as defined by the UCSPA, the motion to dismiss the plaintiffs' Utah consumer protection claim is GRANTED as to CADA and NADA.

As to the remaining defendant automobile companies, the UCSPA prohibits both deceptive acts or practices, Utah Code Ann. § 13–11–4, and unconscionable acts or practices, Utah Code Ann. § 13–11–5. I have previously determined that the plaintiffs do not adequately allege fraud or deception. (Section 13–11–4 in the UCSPA enumerates the types of behaviors that constitute deceptive acts or practices: the plaintiffs' allegations do not fall into any of the enumerated categories.) I turn, therefore, to whether the alleged anticompetitive conduct is an unconscionable practice in violation of the UCSPA.

The Utah Consumer Sales Practices Act is modeled on the Uniform Consumer Sales Practices Act ("Uniform Act"). Pridgen, *supra*, § 3:7; *see also Carlie v. Morgan*, 922 P.2d 1, 7 (Utah 1996) (Howe, J., concurring). In the section prohibiting unconscionable consumer sales practices, the Uniform Act provides: "In determining whether an act or practice is unconscionable, the court shall consider *circum-* *stances such as the following* of which the supplier knew or had reason to know," and then lists six circumstances to guide courts. Unif. Consumer Sales Practices Act § 4(c) (emphasis added). In contrast, the Utah consumer protection statute does not include the circumstances listed in the Uniform Act, but instead states more broadly that "[i]n determining whether an act or practice is unconscionable, the court shall consider circumstances which the supplier knew or had reason to know." Utah Code Ann. § 13–11–5(3). The Utah statute therefore does not limit courts to the circumstances listed in the Uniform Act, but allows courts to consider *any* circumstance that "the supplier knew or had reason to know." *Id.*

Utah courts, in the few cases in which they have had the occasion to address unconscionability under the UCSPA, have looked to contract law concepts to define "unconscionable." *See Woodhaven Apartments v. Washington*, 942 P.2d 918, 925 (Utah 1997) (using contract definitions of "unconscionability" to evaluate a claim that a liquidated damages provision in a residential lease violated the UCSPA); *Wade v. Jobe*, 818 P.2d 1006, 1016–17 (Utah 1991), *overruled on other grounds by Carlie v. Morgan*, 922 P.2d 1 (Utah 1996) (looking, in dicta, to standards articulated in the Uniform Commercial Code and contract law to determine that a landlord's repeated failure to repair a known sewage problem was unconscionable under the UCSPA); *see also Imperial Mobile Home Park, L.L.C. v. Kelsch*, No. 971591–CA, 1998 WL 1758393, at *1 (Utah App. Nov. 27, 1998) (noting that a showing of "gross bargaining power inequality or oppressive contractual terms [is] necessary to establish unconscionability" under the UCSPA). Unconscionability of contract is analyzed in terms of procedural unconscionability and substantive unconsciona-

bility. *Woodhaven Apartments*, 942 P.2d at 925. Procedural unconscionability "focuses on the manner in which the contract was negotiated and the circumstances of the parties," whereas substantive unconscionability "examines the relative fairness of the obligations assumed." *Resource Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1041 (Utah 1985). Substantive unconscionability "requires a disparity that is so great as to 'shock the conscience.'" *Woodhaven Apartments*, 942 P.2d at 925 (quoting *Resource Mgmt.*, 706 P.2d at 1041). "'Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties *together with contract terms which are unreasonably favorable to the other party.'*" *Resource Mgmt.*, 706 P.2d at 1043 (quoting *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965)).

Although section 13–11–5(2) in the UCSPA states that "[t]he unconscionability of an act or practice is a question of law for the court," at this stage I do not have sufficient information to come to a conclusion as to whether or not the defendants engaged in unconscionable behavior under Utah law. The motion to dismiss the plaintiffs' Utah consumer protection claim against the defendant automobile companies is therefore DENIED.

### Vermont Consumer Protection Claim

The Vermont Consumer Fraud Act ("VCFA") prohibits "unfair or deceptive acts or practices in commerce." Vt. Stat. Ann. tit. 9, § 2453(a). It authorizes a private cause of action by "any consumer who

contracts for goods or services in reliance upon ... or who sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by section 2453 of this title." [71] Vt. Stat. Ann. tit. 9, § 2461(b).

The defendants argue that to state a consumer protection claim under the VCFA, the plaintiffs must allege fraudulent or deceptive commercial practices. Defs.' Mot. at 7; *id.* App. I.A, at 8. I have found that the Second Amended Complaint fails to make such allegations. It is true that Vermont cases dealing with allegations of consumer fraud have required the plaintiff to allege a misleading representation. *See, e.g., Greene v. Stevens Gas Serv.*, 858 A.2d 238, 243–44 (Vt.2004); *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 636 A.2d 744, 748 (1993). In *Lalande Air & Water Corp. v. Pratt*, however, the Supreme Court of Vermont announced that it had not yet decided the question "whether the [VCFA] provides a private cause of action for 'unfair' as opposed to deceptive acts, or requires 'reliance' for such a claim." 173 Vt. 602, 795 A.2d 1233, 1235 (2002).

The question raised but left unanswered in *Lalande* arises from the ambiguous language of section 2461 of the VCFA, which provides a private remedy for "false or fraudulent representations or practices prohibited by section 2453." Vt. Stat. Ann. tit. 9, § 2461(b). If "false or fraudulent" modifies both "representations" and "practices," then a private plaintiff may only bring an action for false or

---

**71.** Section 2453(a) of the VCFA also prohibits "[u]nfair methods of competition in commerce," and in paragraph 107 in Count III of the Second Amended Complaint the plaintiffs have pleaded the Vermont antitrust violation under this section. Since 2000, section 2465 of the VCFA has authorized suit by "[a]ny person who sustains damages or injury as a

result of any violation of state antitrust laws, including section 2453 of this title." The defendants have not moved to dismiss the plaintiffs' Vermont antitrust claims. Consequently, I address here only the viability of the plaintiffs' claims under the "unfair or deceptive acts or practices" prong of section 2453(a).

fraudulent conduct. If, however, a plaintiff may bring an action for either "false or fraudulent representations" on the one hand, or "practices prohibited by section 2453" on the other hand, then a plaintiff can state a cause of action by alleging only "unfair . . . acts or practices in commerce" without an accompanying allegation of deception.

In *Elkins v. Microsoft Corp.*, a case decided later the same year as *Lalande*, the Supreme Court of Vermont recognized a private remedy under section 2461,[72] despite the absence of any allegation of fraud or deception.[73] *See* 174 Vt. 328, 817 A.2d 9, 12, 20 (2002). Although *Elkins* did not refer to *Lalande*, I see no way to read the decision other than as answering the question left open in *Lalande*. According to *Elkins*, "[t]he Legislature clearly intended the VCFA to have as broad a reach as possible in order to best protect consumers against unfair trade practices." 817 A.2d at 13. *See also Carter v. Gugliuzzi*, 168 Vt. 48, 716 A.2d 17, 21 (1998) (stating that "we apply the [VCFA] liberally to accomplish its purposes" of protecting the public against unfair or deceptive acts or practices). Thus, Vermont now permits private plaintiffs to seek relief under section 2461 for "practices prohibited by section 2453" without requiring allegations of "false or fraudulent representations." I

therefore conclude that the plaintiffs' claims against the automobile companies under the VCFA should survive the defendants' motion to dismiss.

The VCFA provides for relief against "the seller, solicitor *or other violator.*" Vt. Stat. Ann. tit. 9, § 2461(b) (emphasis added). The VCFA does not require that a defendant have directly engaged in trade with consumers. Therefore CADA and NADA are not exempt from VCFA coverage.

Consequently, the motion to dismiss the plaintiffs' claims under the Vermont Consumer Fraud Act is DENIED.

### Virginia Consumer Protection Claim

The Virginia Consumer Protection Act ("VCPA"), Va.Code Ann. §§ 59.1–196 to –207, prohibits a list of what are described as "fraudulent acts or practices." Va.Code Ann. § 59.1–200. The only listed item potentially applicable to this case prohibits the use of "any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va.Code Ann. § 59.1–200(14). Thus, the plain language of the statute requires fraud or misrepresentation, and Virginia courts have so interpreted it.[74] *See Lambert v. Downtown Garage, Inc.*, 262 Va. 707, 553 S.E.2d 714,

---

**72.** *Elkins* was an antitrust case, but at the time of the objected-to conduct, in February 1999, 817 A.2d at 10, there was no remedy for an antitrust violation except the ambiguous language of section 2461. Thus, by allowing an antitrust remedy under section 2461, the court permitted a plaintiff to proceed in the absence of fraud. (Thereafter, section 2465 was added, providing a specific private right of action for a violation of state antitrust laws.)

**73.** Likewise, in *Russell v. Atkins*, the Supreme Court of Vermont permitted a claim for anticompetitive behavior under the VCFA to survive a motion for summary judgment on facts that did not include allegations of fraud. 165

Vt. 176, 679 A.2d 333, 336–37 (1996). Like *Elkins*, the events giving rise to the claim in *Russell* occurred before section 2465 was enacted.

**74.** *Blanchette v. Toll Bros.*, No. 176526, 1999 WL 370585, at *2 (Va. Cir. Ct. Apr. 6, 1999) (cited in Pls.' Oral Argument Ex.), does not help the plaintiffs. The issue in *Blanchette* was whether the plaintiffs' Virginia consumer protection claim was regulated by the Federal Consumer Credit Protection Act and thus excluded from the VCPA. *Id. Blanchette* did not address whether the VCPA requires allegations of fraud or misrepresentation. *See id.*

716–18 (2001) (holding that misrepresentation of fact was a necessary element in proof of the plaintiff's claim against an automobile seller for a violation of the VCPA); *Weiss v. Cassidy Dev. Corp.*, No. 206766, 2003 WL 1563425, at *6 (Va. Cir. Ct. Feb. 21, 2003) (citing *Lambert* for the proposition that "[i]n order to state a cause of action for a violation of the VCPA, a plaintiff must allege a fraudulent misrepresentation of fact"); *see also Nigh v. Koons Buick Pontiac GMC, Inc.*, 143 F.Supp.2d 535, 553–54 (E.D.Va.2001) (stating that while "claims of fraud and misrepresentation are distinct under the VCPA," a plaintiff relying on the misrepresentation prong "must still prove a false representation").

I have already determined that the plaintiffs have not adequately alleged fraud or deception, including misrepresentation. Consequently, the motion to dismiss the Virginia consumer protection claim is GRANTED.

### (C) Restitution Claims

The plaintiffs have asserted a claim for "restitution under common law" for fifty states and the District of Columbia. Second Am. Compl. ¶ 4; Pls.' Opp'n App. F. It is a defendant's gain rather than a plaintiff's damage that is the conventional measure of restitutionary recovery.[75] The premise of the plaintiffs' claim here is that the defendants have "benefited" by receiving increased revenues as a result of their "unlawful acts," and that it would be "inequitable for Defendants to be permitted to retain the benefit" that was "conferred by" the plaintiffs. *Id.* ¶ 155. As relief, the plaintiffs seek "a constructive trust consisting of the benefit to Defendants as a result of [their] inequitable conduct."[76] *Id.* ¶ 156.

In contemporary United States common law, restitution based upon unjust enrichment takes at least two forms.[77] "It may

---

**75.** *Aladdin Elec. Assocs. v. Town of Old Orchard Beach*, 645 A.2d 1142, 1145 (Me.1994) ("In an unjust enrichment case, the injury focuses on the benefit realized and retained by the defendant ...."); 1 Dan B. Dobbs, *Law of Remedies* § 4.5(1) (2d ed. 1993) ("Restitution is measured by the defendant's unjust enrichment, not by the plaintiff's loss."); Colleen P. Murphy, *Misclassifying Monetary Restitution*, 55 SMU L.Rev. 1577, 1582 (2002).

**76.** I doubt that a constructive trust is the appropriate remedy. As the United States Court of Appeals for the Seventh Circuit stated in *Williams Electronics Games, Inc. v. Garrity:*

[W]hen restitution is sought in a law case and the plaintiff is not seeking to impress a lien on particular property, but just wants an award of profits, he cannot obtain a constructive trust, because there is no *res* (that is, no fund or other specific piece of property) for the trust to attach to. He can still get restitution in such a case, but as a legal remedy for a legal wrong, not as an equitable remedy for a legal or an equitable wrong.

366 F.3d 569, 577 (7th Cir.2004) (citations omitted); *accord Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213–14, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).

**77.** Professor Rendleman states:

Restitution is divided into two branches. First is restitution for breach, which occurs after the defendant breaches a non-restitution substantive standard by, for example, committing a tort or breaching a contract. Here the plaintiff may choose restitution as an alternative to compensatory damages. Second is freestanding restitution, which the court bases on the defendant's unjust enrichment without finding any other violation of substantive law.

Doug Rendleman, *When is Enrichment Unjust? Restitution Visits an Onyx Bathroom*, 36 Loy. L.A. L.Rev. 991, 993 (2003). Professor Gergen identifies three categories: unjust enrichment, restitution for wrongs and policy-based restitution. Mark P. Gergen, *What Renders Enrichment Unjust?*, 79 Tex. L.Rev. 1927, 1929 (2001). Professor Laycock also identifies three categories: unjust enrichment, disgorgement of the defendant's gains

arise from contracts, torts, or other predicate wrongs." *State, Dep't of Human Servs. ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154 (Iowa 2001). Then it is sometimes called "parasitic."[78] Alternatively, unjust enrichment alone "may also serve as independent grounds for restitution in the absence of mistake, wrongdoing, or breach of contract." *Id.* Then restitution is sometimes called "autonomous" or "freestanding."[79] Academic commentary debates the wisdom of this structure,[80] but there is little debate that it exists.

The reason the plaintiffs seek a restitution remedy here is clear. *Illinois Brick* has stymied their efforts to seek federal antitrust damages. If they face similar obstacles to their recovery under state statutes (and the previous sections of this opinion demonstrate that such obstacles exist in many states), only common law restitution can put money in their pockets.[81] This background, the Second Amended Complaint, and the plaintiffs' legal memorandum initially led me to conclude that the plaintiffs were seeking restitution solely as a remedy for a predicate wrong—the antitrust violation—rather than trying to create liability based upon the freestanding doctrine of unjust enrichment.[82] But I also see portions of the plaintiffs' legal memorandum[83] that suggest that they are making a claim for freestanding unjust enrichment as well, and the defendants treat them as doing so, Defs.' Reply at 12. I will therefore address both categories.

■■■ Whatever its basis, the defendants ask me to dismiss the restitution claim *in toto.* Defs.' Mot. at 17. They argue that the common law of no state recognizes this *restitution claim* because: (a) the dealer associations received *no* benefit from the plaintiff consumers, and any benefit to the automobile companies came not from the plaintiff consumers but from the dealers to whom the automobile companies wholesaled their vehicles; (b) the plaintiff con-

---

and specific restitution. Douglas Laycock, *The Scope and Significance of Restitution*, 67 Tex. L.Rev. 1277, 1284 (1989)

**78.** Ofer Grosskopf, *Protection of Competition Rules Via the Law of Restitution*, 79 Tex. L.Rev.1981, 2010 (2001); *see also* Hanoch Dagan, *Restitutionary Damages for Breach of Contract: An Exercise in Private Law Theory*, 1 Theoretical Inquiries L. 115, 133 n. 76.

**79.** *See* Mark P. Gergen, *Restitution as a Bridge Over Troubled Contractual Waters*, 71 Fordham L.Rev. 709, 736–37 (2002); Rendleman, *supra*, at 993.

**80.** *See* Andrew Kull, *Rationalizing Restitution*, 83 Cal. L.Rev. 1191, 1222–26 (1995).

**81.** Using restitution in this way apparently is a growing phenomenon. The plaintiffs cite eight other cases where a similar strategy has been pursued for indirect purchaser claims against the pharmaceutical industry. Pls.' Opp'n at 1 n. 1.

**82.** The plaintiffs say that their restitution claim flows from the defendants' "unlawful acts." Second Am. Compl. ¶ 155; *see also id.* ¶ 3 ("The Automobile Companies were unjustly enriched as a result of this [antitrust group boycott] and conspiracy."); *id.* ¶ 71 (seeking recovery under Count V, the restitution count, for "persons harmed by Defendants' unlawful conduct"); Pls.' Opp'n at 17 (stating that "Plaintiffs here allege that, as a result of Defendants' unlawful conspiracy . . . [Plaintiffs] conferred a benefit . . . that it would be unjust under the circumstances for Defendants to retain"); *id.* at 18 (stating the same basis for the unjust enrichment claims).

**83.** Generally, the plaintiffs do not differentiate between the two bases for restitution. Among the statements supporting the conclusion that they advance the autonomous claim as well are the following: "Plaintiffs here . . . pursue an independent, long recognized, available claim for unjust enrichment." Pls.' Opp'n at 20 n. 34; "[p]laintiffs need not show . . . even that Defendants' conduct was illegal under the laws of any state," *id.* at 16.

sumers entered into contracts to purchase vehicles at voluntarily agreed-upon prices, and therefore have no claim for unjust enrichment; and (c) the plaintiffs cannot use restitution as a means to escape the indirect purchaser limitations that exist on statutory damage remedies.[84] *Id.* at 17–25.

I accept the first argument as to the dealer associations. The Second Amended Complaint alleges no benefit to the dealer associations, let alone a benefit that could be disgorged. The dealer associations are therefore entitled to dismissal of the restitution claims against them.

For the automobile company defendants, I analyze separately the two apparent premises of the plaintiffs' claim for restitution.

### (1) Freestanding or Autonomous Restitution

A claim for freestanding or autonomous restitution in the context of behavior regulated by an independent body of law (here, antitrust and consumer protection statutes) is "more nettlesome" than a parasitic claim.[85] The premise for such a claim must be that,[86] even if the defendants' conduct is blameless under the substantive requirements of federal and state antitrust statutes and state consumer protection statutes, the plaintiffs nevertheless can still obtain restitution of some part of their vehicle purchase price. But such a conclusion could result in restitution undermining another body of substantive law, to the extent that the scope of antitrust laws and consumer protection statutes is designed to permit unfettered economic activity in matters that are not within their proscription.[87] *Cf. Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 936–37 (3d Cir.1999) (stating that in a tort setting, there is "no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court

---

**84.** For states that do permit indirect purchasers to make antitrust claims, the defendants also argue that the "plaintiffs have no need of an unjust enrichment claim because they have an adequate legal remedy," and that "[c]ourts do not impose equitable remedies where plaintiffs have an adequate remedy at law." Defs.' Mot. at 25. This argument is not pertinent to the statutory interpretation undertaking. Indeed, several state antitrust statutes explicitly permit equitable relief. *See, e.g.,* Ariz.Rev.Stat. § 44–1408(B) ("A person threatened with injury or injured in his business or property by a violation of this article may bring an action for appropriate injunctive or other equitable relief . . . ."); D.C.Code Ann. § 28–4508 ("Any person who is injured in that person's business or property by reason of anything forbidden by this chapter may bring a civil action for damages, for appropriate injunctive or other equitable relief, or for both."); S.D. Codified Laws § 37–1–14.3 ("A person injured in his business or property by a violation of this chapter may bring an action for appropriate injunctive or other equitable relief . . . ."). To the extent that I am dealing with a court-created remedy, I observe that the United States Supreme Court has recognized that restitution is often a legal, rather than an equitable, remedy: "The kind of restitution that petitioners seek . . . is not equitable—the imposition of a constructive trust or equitable lien on particular property—but legal—the imposition of personal liability for the benefits they conferred upon respondents." *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. at 214, 122 S.Ct. 708. To be sure, the plaintiffs here have requested a constructive trust, but that probably is not the kind of remedy to which they will ultimately be entitled if they prevail.

**85.** *See* Rendleman, *supra,* at 993.

**86.** Because the plaintiffs do not elaborate upon the basis for a freestanding claim, I must deduce what their argument would be.

**87.** *See* Rendleman, *supra,* at 1002–03 (suggesting "that a judge or jury ought to emphasize the question: Will granting the plaintiff restitution undermine a policy of property, contract, tort or other substantive law?").

properly dismissed the traditional tort claims"). *But see In re Cardizem CD Antitrust Litigation*, 105 F.Supp.2d 618, 669 (E.D.Mich.2000) ("[C]ourts often award equitable remedies under common law claims for unjust enrichment in circumstances where claims based upon contract or other state law violations prove unsuccessful.").

 In any event, unjust enrichment ordinarily does not furnish a basis for liability where parties voluntarily have negotiated, entered into and fully performed their bargain, as consumers do in buying vehicles. According to section 107(1) of *Restatement (First) of Restitution:*

> A person of full capacity who, pursuant to a contract with another, has performed services or transferred property to the other or otherwise has conferred a benefit upon him, is not entitled to compensation therefor other than in accordance with the terms of such bargain, unless the transaction is rescinded for fraud, mistake, duress, undue influence or illegality, or unless the other has failed to perform his part of the bargain.[88]

The automobile purchasers here paid their purchase prices and obtained their vehicles. The Second Amended Complaint does not seek to rescind these sales, and it does not assert that purchasers failed to receive the benefit for which they bargained in buying the vehicles.

For these reasons, I conclude that the plaintiffs cannot prevail on a claim of restitution based upon freestanding unjust enrichment.

### (2) Restitution for a Wrong (Parasitic Restitution)

The more likely basis of the plaintiffs' claim for restitution is that the defendants engaged in wrongful conduct in violating the antitrust laws and that any resulting benefit they gained is unjust enrichment. The critical issue here, where violation of other substantive laws is the premise for recovery, is the effect of any statutory definition of the remedy. In other words, the statute creating liability can override otherwise relevant common law restitution principles by permitting such relief, by prohibiting such relief or by limiting or enlarging the scope of restitutionary relief. In this case, the allegations of unlawfulness concern federal antitrust law, state antitrust law and state consumer protection statutes. In that context, I do not have unlimited compass as a common law judge to determine what the remedy should be. Instead, I must determine whether a restitutionary remedy is available for those particular statutory viola-

---

[88]. *Accord Ferrone v. Resnick*, No. CV000443779S, 2002 WL 442314, at *4 (Conn.Super.Ct. Feb. 25, 2002) (holding that the plaintiffs could not recover for unjust enrichment because "[t]he sale mutually benefited both parties" and the plaintiffs did not show "that the defendant received a benefit for which he did not pay"); *Restatement (Third) of Restitution and Unjust Enrichment* Topic 2 ("Restitutionary Remedies for Breach of an Enforceable Contract") intro. note (2), at 298 (Tentative Draft No. 3, March 22, 2004) (referring to "one of the axioms of the law of unjust enrichment, according to which the measure of value between parties to a valid consensual exchange is definitively fixed by their agreement"); *id.* Topic 2 rep.'s note at 301 ("The controlling proposition is that claims based on restitution and unjust enrichment yield to the terms of a valid and enforceable contract between the parties."). *But see In re K–Dur Antitrust Litig.*, 338 F.Supp.2d 517, 545–46 (D.N.J.2004) (denying summary judgment and concluding that exchange of "any consideration" does not bar recovery; whether the benefit received approximates the price paid (*i.e.*, whether the enrichment is just or unjust) is the issue and is primarily a question of fact).

tions, either (a) as a direct matter of statutory interpretation or (b) as the plaintiffs apparently perceive it, on the basis that the statutory violation results in an unjust enrichment of the defendant in the common law sense, and that I can thereupon determine an appropriate common law remedy independent of the statutory remedies.

### (i) Restitutionary Recovery for Violations of Federal Antitrust Law

██ Certainly no restitutionary remedy can escape the limitations the United States Supreme Court imposed on federal antitrust recovery in *Illinois Brick*, and the plaintiffs do not argue that it can.[89] Therefore, as indirect purchasers, the plaintiffs may not use state common law restitution to recover money from the defendants for violation of the federal antitrust laws.[90]

### (ii) Restitutionary Recovery for Violations of State Antitrust Law

Some states permit indirect purchasers to recover under their antitrust statutes and some do not. For those states that have maintained the *Illinois Brick* prohibition on indirect purchaser recovery, I conclude that it would subvert the statutory scheme to allow these same indirect purchasers to secure, for the statutory violation, restitutionary relief at common law (or in equity).[91] But the defendants have presented no authority to show that where state law *does* allow an indirect purchaser to recover for violating state antitrust statutes, the recovery must be measured only by the damage to the plaintiff rather than

---

89. *See In re Terazosin Hydrochloride Antitrust Litig.*, 160 F.Supp.2d 1365, 1380 (S.D.Fla. 2001) (stating that "[t]he end payors' unjust enrichment claim raises identical concerns" to those expressed in *Illinois Brick*).

90. *Cf. FTC v. Mylan Labs., Inc.*, 62 F.Supp.2d 25, 41–42 (D.D.C.1999) (dismissing the plaintiffs' claims for disgorgement relief under section 16 of the Clayton Act in light of *Illinois Brick*). The plaintiffs have not argued that I should create a federal common law of unjust enrichment and restitution as a measure of recovery for the federal antitrust violation. If such were even possible, *Illinois Brick* would certainly control its contours.

91. *See In re Terazosin*, 160 F.Supp.2d at 1379–80; *see also In re Microsoft Corp. Antitrust Litig.*, 241 F.Supp.2d 563, 565 (D.Md. 2003) (interpreting Kentucky law and preventing indirect purchasers from recovering on their unjust enrichment claim for antitrust violations where they could not recover under state antitrust law); *Stutzle v. Rhonepoulenc S.A.*, NO. 0027680CT.TERM2002, 2003 WL 22250424, at *2 (Pa.Com.Pl. Sept. 26, 2003) (concluding that "to allow plaintiffs to use a claim for unjust enrichment as a means for collecting damages which are not allowable by Pennsylvania's antitrust law, [sic] is not a proper use of the claim"). *But see Freeman*

*Indus. LLC v. Eastman Chemical Co.*, No. E2003–00527–COA–R9–CV, 2004 WL 1102435, at *9–10 (Tenn.Ct.App. May 18, 2004), *appeal granted*, E2003–000527–SC–S09–CV, 2004 Tenn. LEXIS 857 (Oct. 4, 2004). In *Freeman Industries*, the Court of Appeals of Tennessee allowed a restitution claim based on antitrust violations to proceed even though the plaintiff could not recover under the Tennessee antitrust statute. The plaintiff was an indirect purchaser in New York and one of the defendants conducted its business in Tennessee. The court ruled that the Tennessee antitrust statute, because of its geographic limit, would not permit the New York plaintiff to recover under the statute. *See id.* at *1, *7–8, *10. In permitting the Tennessee unjust enrichment claim nevertheless to proceed, the court did not address the inconsistency in prohibiting direct recovery under the Tennessee statute (because of its geographic limit), while potentially allowing restitutionary recovery to the same plaintiff in the same location for the same Tennessee statutory violation. *See id.* at *9–10. (The court ruled that factual issues would determine whether New York or Tennessee law applied to the unjust enrichment claim. *See id.* at *10.)

by the illicit gain to the defendant.[92] Case law and commentary state that where there is a breach of duty, the common law ordinarily permits a plaintiff to choose the remedy: damage to the plaintiff, or gain to the defendant.[93] That principle seems a pertinent starting point in determining what remedy to permit for a statutory violation (itself a breach of duty) as well. It may be that the two recoveries are synonymous in this case, and that the antitrust injury to the plaintiff is identical to the antitrust gain to the defendant.[94] Alternatively (perhaps more likely), any illegal gain may have been shared between the automobile company defendants and the nondefendant dealers so that compensatory damage to a plaintiff would provide a more generous measure of recovery than disgorgement of the manufacturers' gain.[95] It is also possible that a particular state antitrust statute explicitly limits its relief to compensatory damages, not permitting disgorgement of profits, and therefore should be read to preclude the common law restitutionary remedy.[96] The defendants have not yet made such arguments. I conclude, therefore, that at this stage the request for restitutionary relief can remain for the states where state antitrust remedies remain.[97]

**92.** *See Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946) (stating that if a statute confers equity power, a court can order restitution unless the statute contains clear language to the contrary); *In re Terazosin,* 160 F.Supp.2d at 1380 (allowing unjust enrichment claims in jurisdictions that allow statutory indirect purchaser claims, but not in jurisdictions that disallow statutory indirect purchaser claims). In fact, some state antitrust statutes explicitly permit restitutionary relief as a measure of recovery. *See, e.g.,* N.C. Gen.Stat. § 75–15.1 (allowing the court, in a suit instituted by the Attorney General, to "order the restoration of any moneys or property ... obtained by any defendant as a result of such violation").

**93.** *See, e.g., Williams Elecs. Games, Inc. v. Garrity,* 366 F.3d at 576 (Restitution is available in any intentional-tort case in which the tortfeasor has made a profit that exceeds the victim's damages (if the damages exceed the profit, the plaintiff will prefer to seek damages instead) ...."); Laycock, *supra,* at 1286 ("For substantive claims not dependent on the law of restitution—such as those based in ordinary torts and breaches of contract—plaintiff generally has an election. Plaintiff can always claim his own damages; alternatively, he can usually claim defendant's gain.").

**94.** *See, e.g.,* Daniel Friedmann, *Restitution for Wrongs: The Measure of Recovery,* 79 Tex. L.Rev. 1879, 1880 (2001) (noting that the plaintiff's loss and the defendant's gain "ordinarily represent two sides of the same coin").

**95.** On the other hand, if any class that is ultimately certified is narrow, the plaintiff class may see disgorgement of all the ill-gotten gains as potentially more generous than damages.

**96.** *See State ex rel. Kidwell v. Master Distribs., Inc.,* 101 Idaho 447, 615 P.2d 116, 124 (1980) (when deciding whether to allow restitution for a statutory violation, a court should consider the statute's purpose).

**97.** *Cf. FTC v. Mylan Labs., Inc.,* 62 F.Supp.2d 25, 43 (D.D.C.1999) (*"Mylan I"*) ("States with [antitrust] statutes that explicitly provide for restitution or that have been interpreted by state courts as providing such relief; States with [antitrust] statutes that provide for equitable relief and courts that have held the concept of equitable relief to include restitution; and States with [antitrust] statutes that provide, without explicit limitation, for any other equitable relief the court may order, have authority to seek restitution and disgorgement ...."). (The plaintiffs in *Mylan I* were state attorneys general, not private plaintiffs. *Id.* at 32.) To the extent that *Mylan I* allows restitutionary recovery for indirect purchasers in states where antitrust and consumer protection statutes prohibit damages for indirect purchasers, I do not follow it. *See id.* at 46, 49, 56 app. A (dismissing damages claims but not restitution claims brought on behalf of indirect purchasers in Idaho and Missouri); *see also FTC v. Mylan Labs.,* 99 F.Supp.2d 1, 11 (D.D.C.1999) (*"Mylan II"*) (evaluating motion to reconsider *My-*

### (iii) Restitutionary Recovery for Violations of State Consumer Protection Law

As with state antitrust laws, the defendants have pointed me to no authority that state consumer protection statutes limit relief to compensation of a plaintiff's damage rather than disgorgement of a defendant's gain. Therefore, the request for the alternate restitutionary remedy will remain for those states where I have concluded that indirect purchaser plaintiffs may pursue the consumer protection remedy.[98]

### (iv) Restitutionary Recovery of Profits Earned by the Defendants as a Result of Sales in State X Where the Price is Arguably Inflated Because the Defendants Violated a Different State's Antitrust or Consumer Protection Law

The Second Amended Complaint does not say one way or the other whether the plaintiffs are claiming that restitution law principles in State X permit plaintiffs who purchased vehicles in State X to recover in common law restitution from a defendant who has violated the substantive antitrust or consumer protection laws of State Y (or of States Y and Z, etc.).[99] Neither do the legal memoranda address this issue specifically. Because the Second Amended Complaint does seek—for all putative class members—a *pro rata* recovery of all the "Defendants' ill-gotten gains," Second Am. Compl. Prayer for Relief E, however, it is lurking in the case and I conclude that I cannot ignore the issue.

The premise for such a recovery would be that the defendants' behavior in State Y (or in this case, in several or many such states) was both illegal and anticompetitive, and that it had the consequence of keeping new vehicle prices artificially high in State X as well, where the plaintiffs in question purchased their vehicles. On this premise, the defendants' anticompetitive profits are attributable to sales in all states, and arguably all such profits are therefore subject to disgorgement.[100] This

---

*lan I* and retaining restitution but not damages claims on behalf of indirect purchasers in a number of states).

**98.** *See People v. Superior Court of Los Angeles County,* 9 Cal.3d 283, 107 Cal.Rptr. 192, 507 P.2d 1400, 1402 (1973) (holding that restitution is an appropriate remedy for a violation of California's unfair trade practices statute); *Kidwell,* 615 P.2d at 124–25 (stating the same proposition for Idaho's consumer protection statute); *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.,* 82 Wash.2d 265, 510 P.2d 233, 241 (1973) (reaching the same conclusion regarding Washington's consumer protection statute).

**99.** Statutory interpretation will determine whether the residents of State X can recover statutory remedies from defendants who violate the statutory laws of State Y. Generally, I expect that such recovery is unlikely, *see, e.g., Freeman Indus.,* 2004 WL 1102435, at *7 (affirming the trial court's ruling that a plaintiff who made purchases in New York could not recover under Tennessee's antitrust statute because the statute does not apply to transactions outside Tennessee), but because the parties have not addressed the particular statutes in these terms, I do not decide the issue.

**100.** This is not the same as the controversial notion of "umbrella liability." (Under a theory of umbrella liability, an antitrust plaintiff seeks damages for purchases from the defendants' competitors because the defendants, as a result of their conspiracy, created a "price umbrella" under which nonconspiring competitors could charge artificially high prices. *See In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,* 691 F.2d 1335, 1338–41 (9th Cir.1982); *Mid–West Paper Products., Co. v. Continental Group, Inc.,* 596 F.2d 573, 583–87 (3rd Cir.1979); *In re Beef Indus. Antitrust Litig.,* 600 F.2d 1148, 1166 n. 24 (5th Cir.1979).)

argument presents difficult choice-of-law issues. But at least one state court has denied summary judgment to defendants in such a case.[101] Because the parties have briefed neither the choice-of-law issues nor the question whether particular state restitution laws do in fact permit such a recovery, and because the answer well may vary from state to state and circumstance to circumstance, I do not yet rule on the issue.[102] (I suspect it is also not subject to resolution on a motion to dismiss and will require a factual record.) [103]

Accordingly, the defendants' motion to dismiss the restitution claim is GRANTED in its entirety as to CADA and NADA. Otherwise, it is GRANTED IN PART and DENIED IN PART, with the restitution claim remaining as to those states where I have ruled that indirect purchasers can pursue state antitrust or state consumer protection remedies.

## III. CONCLUSION

The Motion to Dismiss Certain Claims in Plaintiffs' Second Amended Complaint is GRANTED IN PART and DENIED IN PART. The plaintiffs may proceed on their claims for damages or restitution for antitrust violations under the laws of sixteen states and the District of Columbia, and for consumer protection violations under the laws of fourteen states and the District of Columbia.

So ORDERED.

---

**101.** *See Freeman Indus.*, 2004 WL 1102435, at *10 (affirming trial court's denial of summary judgment on unjust enrichment claim because the issue of which state's law should apply (that of New York, where the transaction occurred, or Tennessee, whose laws the plaintiff claimed the defendant violated) was a fact question "inappropriate for summary judgment").

**102.** The argument still would not permit a restitutionary claim against the dealer associations, however, because there is no assertion that the associations have received a benefit from any increased revenues to the automobile companies.

**103.** I have not addressed one of the arguments the defendants make, that a plaintiff seeking restitution for unjust enrichment must have conferred a benefit directly upon the defendant. That topic has divided the courts. A number of courts have held that indirect purchasers cannot recover restitution/disgorgement. *See In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 286–87 (D.Mass.2004) (interpreting North Carolina law); *In re Vitamins Antitrust Litig.*, MDL 1285, 2001 WL 849928, at *9 (D.D.C. April 11, 2001) (construing Tennessee law); *Mylan I*, 62 F.Supp.2d at 43–54 (analyzing unjust enrichment claims brought under Alaska, Arkansas, Colorado, Connecticut, Florida, Idaho, Iowa, Kentucky, Louisiana, Maine, Michigan, Minnesota, Missouri, New York, North Carolina, Ohio, Oklahoma, Oregon, South Carolina, Tennessee, Texas, Utah, Vermont, Washington, and West Virginia law); *Stutzle*, 2003 WL 22250424, at *1 (interpreting Pennsylvania law). Other courts, however, have concluded that a direct benefit is not required for an unjust enrichment claim. *See In re K–Dur*, 338 F.Supp.2d at 544–45 (evaluating "claims under the unjust enrichment laws of fifty states, the District of Columbia, and Puerto Rico"); *In re Cardizem*, 105 F.Supp.2d at 668–71 (reviewing plaintiffs' Alabama, California, District of Columbia, Illinois, Michigan, Minnesota, New York, North Carolina, Tennessee and Wisconsin unjust enrichment claims); *State, Dep't of Human Servs. ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 155 (Iowa 2001); *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 778 N.Y.S.2d 147, 149 (1st Dep't 2004); *Freeman Indus.*, 2004 WL 1102435, at *10 (analyzing Tennessee law). I do not resolve its application in this case because I have dismissed the plaintiffs' freestanding unjust enrichment claim. Perhaps I will ultimately have to decide it in dealing with the "parasitic" restitution claims that remain, but I will first want to see the parties' arguments on the specific language of the individual states' statutory remedies.